1

2

3

4

5

6

UNITED STATES DISTRICT COURT
7   WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   SUQUAMISH TRIBE, a federally-          )   Civil No. _____
recognized Indian Tribe,                  )
9               Plaintiff,                 )   COMPLAINT FOR DECLARATORY AND
v.                                         )   INJUNCTIVE RELIEF
10                                         )
The UNITED STATES ARMY CORPS OF           )   (Pursuant to the United States Constitution,
11  ENGINEERS, an agency within the United )   the Rivers and Harbors Act of 1899, the Clean
States Department of Defense; JOHN        )   Water Act, the National Environmental Policy
12  McHUGH in his official capacity as     )   Act, the Endangered Species Act, and the
Secretary of the Army; COLONEL BRUCE      )   Administrative Procedure Act)
13  A. ESTOK in his official capacity as   )
Commander and District Engineer of the    )
14  Seattle District of the United States  )
Corps of Engineers; the UNITED STATES     )
15  DEPARTMENT OF THE NAVY, an agency      )
within the United States Department of     )
16  Defense; RAY MABUS in his official     )
capacity as Secretary of the Navy; ROGER   )
17  M. NATSUHARA in his official capacity as )
Principal Deputy Assistant Secretary of the )
18  Navy; CAPTAIN PETER M. DAWSON, in      )
his official capacity as Commanding Officer )
19  of Naval Base Kitsap; the NATIONAL     )
MARINE FISHERIES SERVICE, a part of        )
20  the National Oceanic and Atmospheric   )
Administration, an agency within the United )
21  States Department of Commerce; and     )
WILLIAM W. STEELE, JR., in his official     )
22  capacity as Regional Administrator of the )
National Marine Fisheries Service,         )
23              Defendants                 )

COMPLAINT FOR DECLARATORY          Page 1
AND INJUNCTIVE RELIEF

# INTRODUCTION

1.      This is a civil action brought by plaintiff Suquamish Tribe, a federally recognized Indian Tribe, for declaratory and injunctive relief under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551–706. The claims arise from defendants violations of the Treaty of Point Elliott, the Supremacy Clause, and the Fifth Amendment to the United States Constitution; the Rivers and Harbors Act of 1899 (the "RHA"), 33 U.S.C. § 403, and its implementing regulations, 33 C.F.R. Part 320; section 404 of the Clean Water Act (the "CWA"), 33 U.S.C. § 1344, and its implementing regulations, 33 C.F.R. Part 320; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f, and its implementing regulations, 40 C.F.R. Parts 1500–1508; and the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531–1599, and its implementing regulations, 50 C.F.R. Part 402.

2.      The Suquamish Tribe brings its claims pursuant to the right of review provision of the APA, 5 U.S.C. § 702, and 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1362 (federally-recognized Indian Tribe as plaintiff), and 28 U.S.C. § 1346 (United States as defendant).

3.      The defendants violated federal law and the Tribe's treaty rights in their evaluation and approval of a second explosives handling wharf at Naval Base Kitsap. The base is located on the eastern shore of Hood Canal in Bangor, Washington, and consists of seven large piers or wharfs. The proposed new wharf will cover approximately 6.3 acres and will increase the total over-water surface of the Navy's facilities by nearly 25 percent. The new wharf will extend 600 feet from the shoreline and will require the installation of up to 1,250 steel pilings over the course of three years. As the final permitting authority for the new wharf, with the issuance of Permit NWS-2009-572 on August 21, 2012, the Army Corps of Engineers has authorized construction of the new wharf.

COMPLAINT FOR DECLARATORY        Page 2
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

4.      Hood Canal is located within the Suquamish Tribe's adjudicated usual and accustomed fishing grounds, which the Suquamish Tribe reserved in the Treaty of Point Elliott, 12 Stat. 927 (1855). The new wharf will physically occupy and displace the Tribe's usual and accustomed fishing grounds in this portion of Hood Canal and will extinguish rights reserved to the Tribe in the Treaty of Point Elliott.

5.      Installation of the pilings will also cause a substantial amount of underwater noise for several years, which defendants have stated can and will injure species listed under the ESA. These species include Hood Canal summer-run chum salmon, Puget Sound Chinook salmon, Puget Sound steelhead, and three species of rockfish that include the endangered bocaccio. Several species including fall run chum salmon are not ESA-listed but are present, including coho and pink salmon, forage fish, and other marine fish species.  High decibel noise passing through the bodies of these fish can rupture the fish's air sac and cause internal hemorrhaging and death. The zone of injury resulting from the pile installation will extend up to 1,522 feet in all directions from the construction site, or more than 2,100 feet from the shoreline.

6.      Construction noise may also impede the species' ability to evade predators, force juvenile fish into deeper water where there is less productive feeding habitat and they are more vulnerable to predation, and will delay or hinder migration to and from the ocean. After construction is complete, the proposed new wharf will permanently disrupt these migrations.

7.      The Army Corps of Engineers and the Department of the Navy, including defendants' agents and officers, violated the Tribe's rights under the Treaty of Point Elliott, the United States Constitution, and the federal trust obligation owed to the Tribe in approving the new wharf. The Army Corps of Engineers acted without statutory authority in issuing permits under the RHA and CWA § 404. The Department of the Navy failed to meet its duties under

COMPLAINT FOR DECLARATORY          Page 3
AND INJUNCTIVE RELIEF

1  NEPA, including but not limited to failing to take a "hard look" at the environmental

2  consequences of its decision and performing an analysis commensurate with the scale of the

3  action at issue; conducting a proper alternatives analysis; responding to comments; preparing a

4  direct, indirect, and cumulative effects analysis; and providing the decision maker with

5  information necessary to make an informed decision. The National Marine Fisheries Service

6  failed to meet its statutory obligations under the ESA by failing to consider scientific information

7  in the preparation of the biological opinion; failing to evaluate the effects of the new wharf on

8  each species listed under the ESA; and failing to make consistent and credible findings with

9  respect to the impacts on each individual species.

10      8.      The Suquamish Tribe seeks declaratory and injunctive relief, including

11  preliminary injunctive relief. The requested relief is necessary to preserve the status quo, to

12  prevent illegal agency action, and to forestall irreparable injury. The Tribe has no other adequate

13  remedy at law.

## JURISDICTION, VENUE, AND BASIS FOR RELIEF

15      9.      This Court has jurisdiction over this action under 5 U.S.C. §§ 701–706 (the APA),

16  28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1362 (federally-recognized Indian Tribe as

17  plaintiff), and 28 U.S.C. § 1346 (United States as defendant). Judicial review is authorized by 5

18  U.S.C. § 706 because the Suquamish Tribe will suffer legal wrong and is adversely affected by

19  final agency action within the meaning of the RHA, the CWA, NEPA, and the ESA.

20      10.     Venue lies in this district under 28 U.S.C. § 1391(b) and (e)(2) because a

21  substantial portion of lands/waters and events/omissions giving rise to the claims stated herein

22  occurred in this district. This complaint is properly filed at the Seattle Courthouse pursuant to CR

23  5(e)(1) because the decisions of the Army Corps of Engineers and the National Marine Fisheries

COMPLAINT FOR DECLARATORY          Page 4
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1  Service challenged herein were issued in King County and the responsible divisions of the Army

2  Corps of Engineers and the National Marine Fisheries Service are located in King County.  The

3  Tribe's claims against the Corps and the National Marine Fisheries Service therefore arise in

4  King County.

5       11.     Declaratory relief is appropriate under 5 U.S.C. § 703 and 28 U.S.C. § 2201.

6  Injunctive relief is appropriate under 5 U.S.C. § 703 and 28 U.S.C. § 2202.

7  **PARTIES**

8       12.     Plaintiff, the SUQUAMISH TRIBE, is a federally-recognized Indian Tribe with a

9  governing body recognized by the Secretary of the Interior. The Suquamish Tribe is located in

10  Kitsap County, Washington, and has fished the waters of Puget Sound, including Hood Canal,

11  since time immemorial. This action is brought by the Suquamish Tribe on its own behalf and on

12  behalf of its members *parens patriae*. By bringing this action, the Suquamish Tribe does not

13  waive its sovereign immunity from suit.

14       13.     Before treaty time and up to the present day, the Suquamish Tribe and its

15  members have actively used natural and cultural resources in Hood Canal, including the area of

16  the project site, for subsistence harvesting of finfish and shellfish, camping, and for cultural and

17  ceremonial purposes. The Suquamish Tribe and its members also actively engage in recreational

18  activities in the project area. The Suquamish Tribe currently owns tideland property in Hood

19  Canal south of the project site and currently uses those tidelands for ceremonial harvesting of

20  shellfish for its members. In addition, the Suquamish Tribe and its members harvest fish for

21  commercial and subsistence purposes north of the Hood Canal Bridge.

22       14.     The Suquamish Tribe is a co-manager of finfish and shellfish resources in Puget

23  Sound, including Hood Canal, in partnership with the State of Washington and other Puget

COMPLAINT FOR DECLARATORY     Page 5
AND INJUNCTIVE RELIEF

Sound tribes. As a co-manager, the Tribe is actively involved in the annual management of salmon fisheries that, due to the migratory nature of salmon, overlap geographically across the marine landscape, including that portion of Hood Canal at or near the project site.

15.    The Suquamish Tribe is also involved in the co-management of shellfish in Puget Sound, including Hood Canal, including in the area at or near the Project site.

16.    The Suquamish Tribe engages in other conservation efforts and other fisheries resources recovery activities within Hood Canal.

17.    Defendant UNITED STATES ARMY CORPS OF ENGINEERS is an administrative agency of the United States within the United States Army, a part of the United States Department of Defense. The United States Army Corps of Engineers is responsible for issuing permits under the RHA for the placement of any structure in the navigable waters of the United States. The United States Army Corps of Engineers is also responsible under the CWA for issuing permits for the discharge of dredged or fill material.

18.    Defendant JOHN McHUGH is the acting Secretary of the Army.

19.    Defendant COLONEL BRUCE A. ESTOK is the acting Commander and District Engineer of the Seattle District of the United States Army Corps of Engineers.

20.    Defendants United States Army Corps of Engineers, John McHugh, and Colonel Bruce A. Estok are referred to collectively herein as "the Corps" or "Corps of Engineers."

21.    Defendant UNITED STATES DEPARTMENT OF THE NAVY is an administrative agency of the United States within the United States Department of Defense. The Navy is charged with complying with the procedural requirements of NEPA before undertaking any action that may significantly affect the environment.

22.    Defendant RAY MABUS is the acting Secretary of the Navy.

COMPLAINT FOR DECLARATORY          Page 6
AND INJUNCTIVE RELIEF

23.     Defendant ROGER M. NATSUHARA is the Principal Assistant Secretary of the Navy.

24.     Defendant Captain PETER M. DAWSON is the Commanding Officer of Naval Base Kitsap.

25.     Defendants Department of the Navy, Ray Mabus, Roger M. Natsuhara and Captain Peter M. Dawson are referred to collectively herein as "the Navy."

26.     The Secretary of Commerce has delegated his duties under the ESA to Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS"). NMFS is the agency within the United States Department of Commerce responsible for administering the provisions of the ESA with regard to marine species and anadromous fish.

27.     Defendant WILLIAM W. STEELE, JR. is the Regional Administrator of NMFS – Northwest Regional Office.

28.     Defendants National Marine Fisheries Service and Will Steele are referred to collectively herein as "NMFS."

## LEGAL BACKGROUND

### *Treaty of Point Elliott*

29.     On January 22, 1855, the Suquamish Tribe, along with several other Indian Tribes, entered into the Treaty of Point Elliott with the United States government. Article 5 of the Treaty states, in part, "[t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens." This provision preserves the right of the Suquamish Tribe to access its usual and accustomed fishing grounds.  The United States government may not physically displace the Tribe from its usual and accustomed fishing grounds without the express authorization of the United States Congress.

COMPLAINT FOR DECLARATORY          Page 7
AND INJUNCTIVE RELIEF

30.     The phrase "usual and accustomed fishing grounds" means "'every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters.'" *U.S. v. Confederated Tribes of the Colville Indian Reservation*, 606 F.3d 698, 711 (9th Cir. 2010) (quoting *U.S. v. State of Wash.*, 384 F.Supp. 312, 332 (W.D. Wash. 1974).

31.     In 1978, Judge Boldt of the United States District Court for the Western District of Washington adjudicated the boundaries of the Suquamish Tribe's usual and accustomed fishing grounds under the Treaty of Point Elliott. *See U.S. v. State of Washington*, 459 F. Supp. 1020, 1049 (1978). That decision determined that the Suquamish Tribe's usual and accustomed fishing grounds include "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal." The Navy's proposed second explosives handling wharf at Bangor, Washington is located in Hood Canal and, therefore, is within the Suquamish Tribe's usual and accustomed fishing grounds.

32.     The Supremacy Clause of the United States Constitution, Article VI, clause 2, states in part that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." As the supreme law of the land, rights reserved by the Suquamish Tribe under the Treaty of Point Elliott may not be abrogated or diminished without the specific and express consent of the United States Congress.

33.     The Suquamish Tribe's treaty rights are also property rights in the nature of a servitude or *profit à predre,* and are protected under the Fifth Amendment of the United States Constitution.

COMPLAINT FOR DECLARATORY          Page 8
AND INJUNCTIVE RELIEF

34.     In addition to securing the right to access usual and accustomed fishing grounds, the Treaty of Point Elliot ensures that there will be sufficient fish populations to be fished and habitat necessary to sustain those fish. *See U.S. v. State of Wash.*, No. CV 9213RSM, 2007 WL 2437166, at *10 (W.D. Wash. Aug. 22, 2007); *No Oilport! v. Carter*, 520 F. Supp. 334, 372–73 (W.D. Wash. 1980); *see also Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032, 1034–35 (9th Cir. 1985). Therefore, absent express statutory authorization, actions by the United States that reduce the number of fish or shellfish available for the Suquamish Tribe's harvest, or damage habitat necessary for their survival, violate the Treaty of Point Elliott.

35.     As signatory to the Treaty of Point Elliott, the United States government has a fiduciary duty and a moral obligation of the highest responsibility and trust to protect Indian treaty rights. *Seminole Nation v. United States*, 316 U.S. 286, 296-297 (1942). This trust obligation includes the obligation not to abridge, through the issuance of any federal permit, license, or other federal action, the Suquamish Tribe's treaty rights.

### *Rivers and Harbors Act of 1899*

36.     Section 10 of the RHA, 33 U.S.C. § 403, prohibits the placement of any structure or other obstruction in the navigable waters of the United States absent a permit issued by the Corps of Engineers.

37.     Regulations governing permits issued under the RHA are found at 33 C.F.R. Part 320. Under these regulations the Corps must undertake a "public interest review" prior to issuing any RHA permit. This review includes the weighing of any "benefits which reasonably may be expected to accrue from the proposal" as well the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

COMPLAINT FOR DECLARATORY     Page 9
AND INJUNCTIVE RELIEF

38.     Pursuant to 33 C.F.R. § 320.4(g), permits issued under the RHA "do[] not convey a property right, nor authorize any injury to property or invasion of other rights." An RHA permit also "does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws and regulations."

39.     In issuing permits under the RHA, the Corps of Engineers is bound by its trust obligation not to abridge or diminish the Suquamish Tribe's treaty rights, including the Tribe's right to access and fish areas within the Tribe's usual and accustomed fishing grounds.

### Section 404 of the Clean Water Act

40.     Section 404 of the CWA, 33 U.S.C. § 1344, prohibits the discharge of any dredged or fill material into the waters of the United States absent a permit issued by the Corps of Engineers.

41.     Like permits issued under Section 10 of the RHA, permits issued under CWA § 404 are subject to the regulations found at 33 C.F.R. Part 320 and do not abridge or diminish property rights. Also like permits issued under the RHA, the Corps is bound by its trust obligation in issuing permits under CWA § 404 not to abridge or diminish the Tribe's treaty rights.

### National Environmental Policy Act

42.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions. Under NEPA, all federal agencies are required to prepare a "detailed statement" assessing the environmental impacts of all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS") and must accompany every proposal for major federal action significantly affecting the quality of the human environment.

COMPLAINT FOR DECLARATORY          Page 10
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

43.     The Council on Environmental Quality ("CEQ") has promulgated regulations to implement NEPA that, pursuant to 42 U.S.C. § 4342, are binding on all federal agencies. The CEQ's regulations are found at 40 C.F.R. Parts 1500–1508.

44.     NEPA's EIS requirement serves two goals. The first goal is to inject environmental considerations into the agency's decision-making process and to ensure the agency has fully and carefully contemplated the environmental effects of its action. The second goal is to inform the public of the environmental impacts and to involve the public in the decision-making process.

45.     An EIS must accurately describe the impacts of the project, including direct, indirect, and cumulative impacts. In analyzing these impacts, the agency must use high quality information and must ensure the scientific integrity of its analysis. 40 C.F.R. § 1502.24.

46.     An EIS must also discuss the significance of the expected impacts, which includes both the context and intensity of impacts. *See id.* §§ 1502.16, 1508.27. Under CEQ's regulations "intensity" refers, in part, to "the degree to which the action may adversely affect an endangered or threatened species." *Id.* at § 1508.27(b)(9). Similarly, "context" "means that the significance of an action must be analyzed in several contexts such as . . . the affected region, the affected interests, and the locality." *Id.* at § 1508.27(a).

47.     An EIS must consider a reasonable range of alternatives to the agency's proposed action. The CEQ and the courts have described the alternatives requirement as the "heart" of NEPA and the "linchpin" requirement. The agency must "rigorously explore and objectively evaluate all reasonable alternatives," *id.* at § 1502.14(a), and must rationally explain the elimination of any alternative, *id.* at § 1503.4. As part of the alternatives analysis, an EIS must

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 11

1   consider ways to mitigate environmental impacts and must include a detailed statement of

2   significant environmental effects that cannot be avoided. *Id.* at § 1502.14(f).

3      48.   An EIS is drafted in two stages. In the first stage, a draft EIS ("DEIS") is created

4   and presented to the public and other agencies for review and comment. In the second stage, a

5   final EIS ("FEIS") is created after assessing and considering comments to the DEIS. Comments

6   should normally result in changes to the text of the EIS, including the development of

7   alternatives or refinement of the agency's analysis. If the agency determines that a comment does

8   not require further response, then the agency must provide a reasoned explanation for its decision

9   not to amend the EIS, citing the sources, authorities, or reasons that support the agency's

10   position. *Id.* at § 1503.4.

11      49.   CEQ's regulations also govern what information must be included in the body of

12   the FEIS, in appendices to the FEIS, and what information may be incorporated by reference.

13   Material prepared in connection with the FEIS and material that substantiates any analysis

14   fundamental to the FEIS must be placed in an appendix. *Id.* at § 1502.18. Other, less critical

15   information may be incorporated into the FEIS by reference, such as general background papers.

16   *Id.* at § 1508.21. The Navy's own regulations incorporate these requirements for classified and

17   other material that may not be released to the public. *See* 32 C.F.R. § 775.5(a)–(b).

18      50.   An agency must complete its NEPA analysis prior to approving the action. When

19   the agency decides to act, it must prepare a concise public record of decision.  40 C.F.R. §

20   1505.2. Among other things, the ROD must "[s]tate whether all practicable means to avoid or

21   minimize environmental harm from the alternative selected have been adopted, and if not, why

22   they were not." *Id.* at § 1505.2(c).

23                          ***Endangered Species Act***

COMPLAINT FOR DECLARATORY          Page 12
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

51.     Congress enacted the ESA in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The two goals of the ESA are to prevent extinction of imperiled species and to facilitate the recovery of imperiled species so that they no longer require protection under the ESA.

52.     To achieve the two goals of survival and recovery, the ESA directs NMFS to determine which marine species of plants and animals are "threatened" or "endangered." *Id*. § 1533. An "endangered" species is currently on the brink of extinction throughout all or a significant portion of its range. *Id*. at § 1532(6). A "threatened" species is a species likely to become endangered within the foreseeable future. *Id*. at § 1532(20). The ESA also charges NMFS with designating "critical habitat," which is defined as those areas "essential to the conservation of the species." *Id*. at §§ 1533(a) (3), 1532(5)(A) & (B).

53.     Section 7 of the ESA requires each federal agency to ensure that its actions are not likely to jeopardize the continued existence of threatened or endangered species or result in the destruction or adverse modification of designated critical habitat. *Id*. § 1536(a)(2).

54.     To avoid jeopardizing listed species or destroying or adversely modifying critical habitat, Section 7 of the ESA establishes an interagency consultation process. *Id*. at § 1536. Under Section 7, a federal agency proposing an action that "may affect" a listed species must prepare a biological assessment (BA) of the effects of the proposed action. *Id*. at § 1536(a)(2); 50 C.F.R. § 402.14(a). The purpose of the BA is to determine whether the action "is likely to adversely affect" the species, which NMFS's consultation handbook defines as having any negative effect.

55.     If the BA concludes that the action "is likely to adversely affect" a listed species, the agency must consult with NMFS under Section 7 of the ESA. NMFS must then review the

COMPLAINT FOR DECLARATORY         Page 13
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1    BA and any other relevant information and determine whether the action is likely to jeopardize a

2    listed species or destroy or adversely modify critical habitat. 50 C.F.R. § 402.14(h)(3). This

3    determination is set forth in a biological opinion ("BiOp") from NMFS. 16 U.S.C. §

4    1536(b)(3)(A).

5         56.    To determine whether the proposed action will jeopardize a listed species or

6    destroy or adversely modify critical habitat, NMFS must determine the "effects of the action."

7    See 40 C.F.R. § 402.02. Effects of the action include those direct, indirect, and cumulative

8    effects when considered in light of the "past and present impacts of all Federal, State, or private

9    actions and other human activities in the action area." *Id.* In turn, the action area includes "all

10   areas to be affected directly or indirectly by the Federal action and not merely the immediate area

11   involved in the action." *Id.*

12        57.    In fulfilling its Section 7 obligations, NMFS must use the best scientific data

13   available, may not ignore relevant biological information, and may not base its conclusion on

14   inconsistent findings of fact.

15                          *Administrative Procedure Act*

16        58.    Section 702 of the Administrative Procedure Act, 5 U.S.C. §702, provides a

17   private cause of action to any person "suffering legal wrong because of agency action, or

18   adversely affected or aggrieved by agency action within the meaning of a relevant statute."

19        59.    Under Section 704 of the APA, 5 U.S.C. § 704, only "final agency actions" are

20   reviewable. A final agency action is one that marks the consummation of the agency's decision-

21   making process and by which rights or obligations have been determined or from which legal

22   consequences flow.

23

COMPLAINT FOR DECLARATORY          Page 14                    Office of Tribal Attorney
AND INJUNCTIVE RELIEF                                         THE SUQUAMISH TRIBE
                                                             P.O. Box 498
                                                             Suquamish, WA 98392
                                                             (360) 598-3311  Fax (360) 598-4293

1    60.    Under Section 706 of the APA, 5 U.S.C. § 706(2)(A), a court "shall. . . hold

2  unlawful and set aside agency action, findings, and conclusions found to be. . . arbitrary,

3  capricious, an abuse of discretion, or otherwise not in accordance with law." Under Section 706

4  of the APA, a court shall also hold unlawful and set aside agency action that is "contrary to

5  constitutional right, power, privilege, or immunity" or that is "in excess of statutory jurisdiction,

6  authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C).

7                              **FACTUAL BACKGROUND**

8                              ***Naval Base Kitsap***

9    61.    Naval Base Kitsap is located approximately 20 miles west of Seattle on the

10  eastern shore of Hood Canal. The base consists, in part, of seven large wharfs or piers, including

11  the existing explosives handling wharf. The existing wharf is used to service the Navy's Trident

12  nuclear submarine fleet.

13    62.    The existing wharf was built in the 1970's.  The Navy is in the process of

14  replacing the pilings that support the structure. The Navy will complete pile replacement in 2024.

15    63.    Because Naval Base Kitsap occupies waters of Hood Canal, the wharfs and piers

16  comprising that facility have permanently displaced the Suquamish Tribe and other tribes from

17  their usual and accustomed fishing grounds. The approval of the second explosives handling

18  wharf will abrogate the Suquamish Tribe's treaty rights for at least 50 years, the lifetime of the

19  structural design of the wharf.

20    *64.*    Congress has never expressly authorized the Navy to abrogate the Suquamish

21  Tribe's federally-secured rights directly connected to the second explosives handling wharf.

22  Thus, Naval Base Kitsap has and continues to operate in direct violation of the Treaty of Point

23  Elliott, the Supremacy Clause of the United States Constitution, and the Fifth Amendment to the

COMPLAINT FOR DECLARATORY          Page 15
AND INJUNCTIVE RELIEF

1    United States Constitution. Federal agency approval of this new wharf is yet one more illegal

2    abrogation of the Tribe's treaty rights and violation of the Constitution at Naval Base Kitsap.

3    ### *Status of ESA-Listed Species and Critical Habitat in Hood Canal*

4    65.    Hood Canal is home to several threatened and endangered species of tribal

5    cultural importance. In an effort to reduce adverse impacts to these fish, the Corps' permit

6    prohibits the Navy from doing in-water construction from February 16 to July 15.  The

7    threatened and endangered species at issue and the times they use the waters near the project site

8    are described in the following paragraphs.

9    66.    Hood Canal summer-run chum salmon (*Onchorhynchus keta*) were listed as

10   threatened under the ESA on March 25, 1999. Summer-run chum salmon have been the focus of

11   considerable conservation efforts over the past decades, but most populations remain depressed.

12   Historically, Hood Canal contained 16 populations of summer-run chum. Today, only seven

13   populations remain and the majority of recent extinctions have occurred on the eastern shore of

14   Hood Canal. For example, populations in eastern rivers and streams south of Naval Base Kitsap,

15   including Anderson Creek, Big Beef Creek, and the Dewato River, have all been extirpated in

16   recent years. Factors for the species' decline include loss and degradation of nearshore habitat

17   from diking, filling, and other obstructions.

18   67.    Hood Canal summer-run chum salmon have been known to enter Hood Canal as

19   juveniles beginning in December in some years, but not all years. These juveniles are dependent

20   on nearshore waters. The timing of their presence in marine waters as juveniles and as adults

21   helps to differentiate the summer and fall-run chum salmon. Summer-run chum juveniles are

22   largely indistinguishable from the much more prevalent, and non-ESA-listed, hatchery and fall-

23

COMPLAINT FOR DECLARATORY          Page 16
AND INJUNCTIVE RELIEF

1    run chum. Juvenile summer-run chum salmon are more prevalent near Naval Base Kitsap than

2    these other species between January and mid-March.

3        68.    Summer-run chum salmon are also distinguished from other Hood Canal

4    salmonids in that summer-run chum adults use nearshore habitat exclusively during their summer

5    return migration. Thus, summer-run chum salmon are dependent on nearshore habitat both as

6    juveniles and adults. Returning adult summer-run chum salmon enter Hood Canal from August

7    through October.  The Navy has stated that these adults are at an increased risk of injury from

8    construction noise associated with the proposed new wharf at Naval Base Kitsap.

9        69.    Puget Sound Chinook salmon (*Oncorhynchus tshawytscha*) were listed as

10   threatened on May 24, 1999. There are currently three populations of Puget Sound Chinook in

11   the mid-Hood Canal area, all south of Naval Base Kitsap. Together, these mid-Hood Canal

12   populations average less than 400 adult spawners per year.

13       70.    Puget Sound Chinook salmon emerge from their natal streams between January

14   and April and occupy increasingly deeper waters as they grow. Defendant NMFS has explained

15   that juvenile Chinook salmon are expected to occur in the area affected by construction noise

16   associated with the new wharf. Recent studies by the Navy have documented that as many as 17

17   percent of Chinook salmon passing near Naval Base Kitsap do so between July and September.

18   Of these, the majority are likely ESA-listed Chinook and not hatchery fish.

19       71.    Puget Sound steelhead (*Oncorhynchus mykiss*) were listed as threatened on May

20   11, 2007. These Steelhead consist of two sub-populations, winter run and summer run. Little is

21   known about the summer run life history, though this species may spawn in two rivers south of

22   Naval Base Kitsap (the Dosewallips and Duckabush Rivers) between February and April.

23   According to recent fish surveys at Naval Base Kitsap, it is apparent that as many as 30 percent

COMPLAINT FOR DECLARATORY          Page 17
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1    of steelhead passing by the naval base do so between July and February. As with summer-run

2    chum and Puget Sound Chinook, populations of steelhead in Hood Canal remain depressed.

3           72.     The Puget Sound/Georgia Basin distinct population segment of bocaccio

4    (*Sebastes paucinspinis*), a species of rockfish, was listed as endangered on April 28, 2010. This

5    species was last observed in Hood Canal in the 1960s and while overall population numbers are

6    unknown, the species is currently at "high risk" for extinction, 75 Fed. Reg. 22276 (April 28,

7    2010). No recent scientific studies have been performed to document the species' status in Hood

8    Canal. Adult bocaccio are known to use deep-water habitat but, like juvenile salmonids, juvenile

9    and sub-adult bocaccio are dependent on the nearshore environment, including nearshore

10   eelgrass and kelp beds. Defendant NMFS has explained that kelp beds along the shoreline of

11   Naval Base Kitsap may be used by juvenile and sub-adult bocaccio.

12          73.     The Puget Sound/Georgia Basin distinct population segment of canary rockfish

13   (*Sebastes pinneger*) was listed as threatened on April 28, 2010. Canary rockfish have a similar

14   life history as bocaccio, with adults using deep waters and juveniles and sub-adults depending on

15   the nearshore environment for survival. Like bocaccio, juvenile and sub-adult canary rockfish

16   may use kelp beds along the shoreline of Naval Base Kitsap.

17          74.     Critical habitat is designated for Puget Sound Chinook salmon and Hood Canal

18   summer-run chum salmon Evolutionary Significant Units ("ESUs) along the shorelines of Hood

19   Canal both north and south of the new wharf site. Critical habitat for these species is also

20   designated along the eastern shoreline of the Toandos Pennisula opposite the project site. Critical

21   habitat extends on the eastern shore of Hood Canal north of the project site within the entire drift

22   cell. (A drift cell is a defined or discrete stretch of shoreline that is quasi-independent of

23   adjacent shorelines in terms of the input, transport, and deposition of sediment.) The nearshore at

COMPLAINT FOR DECLARATORY         Page 18
AND INJUNCTIVE RELIEF

1   Naval Base Kitsap at Bangor is excluded from designated critical habitat for these ESUs because

2   the military lands are covered by an Integrated Natural Resources Management Plan as authorized

3   under the Sikes Act, 16 USC § 670(a) et seq.

4      75.    Under the ESA, NMFS may exclude lands owned by the Department of Defense from

5   designated critical habitat if NMFS determines that the INRMP provides the same benefits to the

6   species as would formal designation of critical habitat under the ESA. 16 U.S.C. §

7   1533(a)(3)(B)(i). On September 2, 2005, NMFS determined that the INRMP for Naval Base

8   Kitsap would provide the same benefits to the species as would formal designation under the

9   ESA, and so NMFS excluded the naval base from the designated critical habitat of summer-run

10  chum and Puget Sound Chinook. 70 Fed. Reg. 52630, 52646 (Sept. 2, 2005). NMFS also

11  determined that the naval base should be excluded from designated critical habitat because of

12  potential impacts on national security. *Id.*

13                    ***The Public Scoping Period***

14     76.    On May 15, 2009 the Navy announced its intent to build a second explosives

15  handling wharf and invited public input on the scope of the upcoming NEPA analysis. This

16  process is known as "scoping." *See* 40 C.F.R. § 1501.7.

17     77.    At a July 8, 2009 public scoping meeting, the Navy informed the public that, due

18  to ongoing pile replacement, "operational days" at the existing wharf are currently limited to

19  approximately 200 days per year. The Navy also explained that it requires approximately 240

20  operational days per year to service the Trident submarine fleet. The Navy did not explain how it

21  calculated the number of operational days needed to service the Trident fleet.

22     78.    The Suquamish Tribe submitted comments on the project during the public

23  scoping period and requested that the Navy consider demolishing the existing wharf after

COMPLAINT FOR DECLARATORY          Page 19

1    completion of the new wharf.  The Tribe explained that the proposed new wharf, by itself, would

2    likely supply the Navy with 240 operational days per year and that one wharf would have less

3    impact on the environment than two.

### *The Draft Environmental Impact Statement*

5    79.    On March 18, 2011 the Navy released its DEIS for the proposed new wharf. As

6    described above, the DEIS proposed a structure that will be approximately 6.5 acres in size and

7    will increase the over-water coverage of the Navy's facilities by nearly 25 percent, further

8    encroaching upon the Suquamish Tribe's usual and accustomed fishing grounds. The new wharf

9    will extend 600 feet from the shoreline and will require the installation of up to 1,250 steel

10   pilings over three years.

11   80.    The DEIS determined that pile installation will generate noise sufficient to injure

12   and kill passing salmonids and other fish, including the ESA-listed species discussed above. The

13   Navy's calculations show that this zone of injury will extend up to 1,522 feet in all directions

14   from the construction site, or more than 2,100 feet from the shoreline. Despite this substantial

15   zone of injury, the DEIS fails in several respects to adequately assess or mitigate impacts to

16   ESA-listed fish. These failings include, but are not limited to, the following:

17         a.    After considering the impacts of the new wharf, the DEIS concluded that the

18   "effect determination" for ESA-listed salmonids is "may affect, likely to adversely

19   affect." The phrase "may affect, likely to adversely affect" is a procedural term of art

20   under the ESA and is irrelevant under NEPA. The DEIS repeated this irrelevant

21   conclusion for ESA-listed rockfish species.

22         b.    The DEIS analyzed effects on all salmonids as a group, without

23   meaningfully distinguishing between impacts on individual species.

COMPLAINT FOR DECLARATORY          Page 20
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

c.    The DEIS failed to analyze effects on local salmonid populations.

d.    To mitigate impacts from construction noise, the DEIS proposed an in-water work window of July 16 to February 15. However, the DEIS failed to mention or discuss surveys and genetic testing conducted in 2007 indicating that the in-water work window will disproportionately impact ESA-listed salmonids.

e.    The DEIS underestimated impacts to ESA-listed salmonids due to construction between July and September (when Puget Sound Chinook juvenile are migrating out and adult summer chum are returning to rivers using the nearshore waters) and between December and February (when Hood Canal summer-run chum juvenile are migrating out).

f.    The DEIS did not discuss the impact of delaying or preventing these migrations or of displacing other species away from their preferred habitats. The DEIS also did not analyze mitigation measures for avoiding these impacts.

g.    The July 16 to February 15 in-water work window was developed by the Army Corps of Engineers between 2004 and 2005 and does not represent best available science.

h.    The cumulative impacts analysis contained many of these same flaws. For example, the DEIS cumulative impacts analysis relied heavily on the unsupported in-water work window and clumps ESA-listed and non-ESA-listed salmonids together when assessing impacts.

i.    The DEIS stated that activities at the naval base would not increase as a result of the new wharf. However, the DEIS acknowledged that the proposed new wharf will essentially double the number of operational days at the two explosives handling

COMPLAINT FOR DECLARATORY    Page 21
AND INJUNCTIVE RELIEF

1    wharfs. The DEIS did not explain how it is possible to double the number of operational

2    days yet not increase activities at the naval base.

3           j.     The Navy did not discuss the added risk to the environment of effectively

4    doubling operations at the explosives handling wharfs, including the increased risk of

5    accidental explosions and environmental contamination.

6    81.    The Suquamish Tribe submitted comments on the DEIS environmental impacts

7    analysis and requested that the Navy shorten the in-water work window to protect summer-run

8    chum and Puget Sound Chinook salmon. The Tribe also requested that the Navy monitor for

9    ESA-listed species prior to, during, and following construction.

10   82.    In addition to its inadequate assessment of impacts to ESA-listed salmonids

11   during construction, the DEIS failed to address, or inadequately addressed, certain direct and

12   indirect effects arising after the construction is complete, including but not limited to, artificial

13   nighttime lighting impacts and overwater shading impacts.

14   83.    In addition to its inadequate assessment of impacts to ESA-listed salmonids, the

15   DEIS did not consider a reasonable range of alternatives and defined the Navy's needs in such

16   narrow terms that only one course of action is possible.

17   84.    The DEIS analyzed five alternatives for the proposed wharf in detail, including

18   four designs differing primarily in construction materials, and the "no-action" alternative

19   required under CEQ's regulations, *see* 40 C.F.R. § 1502.14(d). Each design for the new wharf is

20   substantially larger than the existing wharf.

21   85.    This narrow range of alternatives is driven by the newly-minted claim in the DEIS

22   that the Navy requires approximately 400 operational days per year to service the Trident

23   submarine fleet. Of these 400 operational days, the new wharf is designed to contribute 300 days

COMPLAINT FOR DECLARATORY         Page 22
AND INJUNCTIVE RELIEF

1   and the existing wharf will contribute 200 days until 2024 and 300 days thereafter. Thus, as

2   proposed in the DEIS the new wharf in combination with the existing wharf will provide a larger

3   total facility than the Navy needs to service the submarine fleet.

4       86.     The DEIS did not explain how the Navy calculated this 400-operational-day

5   requirement.

6       87.     The DEIS did not explain why the Navy cannot build a smaller facility that will

7   meet the Navy's needs without providing an excess number of operational days. For example,

8   the DEIS did not explain why the Navy cannot build a new wharf that will provide 200

9   additional operational days instead of a facility that will provide 300 additional operational days.

10      88.     The DEIS also stated that, as proposed, the new wharf is the "minimum structure"

11  capable of meeting the Navy's 400-operational-day requirement. The Navy therefore defined its

12  needs in such narrow terms that only one course of action is capable of fulfilling the Navy's

13  needs – namely, a new wharf at the naval base that provides an excess of operational days.

14      89.     The DEIS indicated that the Navy briefly considered an alternative called the

15  "terminal concept," wherein the Navy would transport nuclear missiles from the submarines to

16  an onshore facility for processing. The Navy rejected this alternative for several reasons, citing

17  environmental impacts, technical problems with operating the terminal concept alongside the

18  existing wharf, and explosives safety requirements. However, the DEIS did not describe the

19  environmental impacts associated with the terminal concept, nor explain why the terminal

20  concept was not considered for replacement of both the existing wharf and the proposed new

21  wharf.  The DEIS did not disclose that, like the terminal concept, the proposed new wharf also

22  will involve outdated safety precautions.

23

COMPLAINT FOR DECLARATORY         Page 23
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

90.     The DEIS included three appendices that were not released for public review and comment. These are Appendix A ("Purpose and Need Supplemental Information"), Appendix B ("Alternatives Considered"), and Appendix C ("Explosives Safety Arcs"). Because these appendices included information substantiating claims in the DEIS, and also contained detailed information regarding the need for the new wharf and alternatives to the project, these appendices were essential to a reasoned choice among the alternatives and should have been publicly disseminated.

91.     Appendices A, B, and C were not publicly disseminated because they contain material marked "Department of Defense Unclassified Controlled Nuclear Information" or "DoD UCNI."

92.     Comments on the DEIS suggested alternatives to the proposed wharf that would help minimize environmental impacts. For example, the Suquamish Tribe suggested that the over-all design of the new wharf could be made smaller by placing office and storage facilities on dry land. The U.S. Environmental Protection Agency also suggested several alternatives, including a smaller berthing and operations area more similar to the existing wharf; a smaller trestle design; locating the new wharf closer to the existing wharf to minimize habitat fragmentation; higher trestle height to help facilitate salmonid migration; fewer pilings; and reduction of night-time lighting.

### The Supplemental Draft Environmental Impact Statement

93.     On October 7, 2011 the Navy issued a supplemental DEIS ("SDEIS").

94.     During the SDEIS public comment period, additional comments suggested ways for the Navy to meet Trident fleet requirements without building the new wharf. These alternatives included additional shifts or increased process efficiencies at the existing wharf,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    Page 24

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1   building an addition to the existing wharf instead of a new wharf, and building an expanded and

2   larger new wharf than envisioned in the DEIS. An expanded and larger wharf might allow the

3   Navy to demolish the existing wharf as requested by the Suquamish Tribe.

4       95.     The Washington Department of Fish and Wildlife commented that the Navy's

5   proposed in-water work window would not protect juvenile migrating salmonids between

6   December and February. The Washington Department of Fish and Wildlife administers in-water

7   work windows for Hood Canal pursuant to regulations at WAC 220-110-271, upon which the

8   DEIS partially relies for its July 16 to February 15 in-water work window.

9                     ***The Final Environmental Impact Statement***

10      96.     On March 21, 2012 the Navy released the FEIS for the proposed new wharf.

11      97.     The FEIS contains many of the same deficiencies as the DEIS with respect to its

12  assessment of environmental impacts. For example, the FEIS does not mention the proposed in-

13  water work window will disproportionately impact ESA-listed species. The FEIS also continues

14  to rely upon the irrelevant procedural language of "may affect, likely to adversely affect" to

15  describe the effects on salmonids and rockfish.

16      98.     The FEIS does not meaningfully respond to the Suquamish Tribe's request to

17  provide additional mitigation by shortening the in-water work window or by monitoring species

18  presence within the zone of injury. In the response to the Tribe's comments, the Navy explains

19  only that the in-water work window is "established for the project location by the regulatory

20  agencies." The Navy does not acknowledge that it is free to utilize a shorter work window than

21  the maximum allowed by the regulatory agencies or why it failed to even consider the possibility

22  of doing so.

23

COMPLAINT FOR DECLARATORY          Page 25            Office of Tribal Attorney
AND INJUNCTIVE RELIEF                                 THE SUQUAMISH TRIBE
                                                          P.O. Box 498
                                                     Suquamish, WA 98392
                                              (360) 598-3311  Fax (360) 598-4293

99.     Like the DEIS, the FEIS does not discuss the impacts of displacing species away from their preferred habitat during construction or obstructing or preventing the nearshore migration of ESA-listed salmonids. The FEIS states that nearshore migrating salmonids will likely not migrate around the proposed construction zone. The FEIS does not, however, state or consider where these fish are supposed to go if they cannot migrate around the construction zone.

100.     Similarly, like the DEIS, the FEIS fails to explain how the Navy intends to double the number of operational days at the two explosives handling wharfs without increasing activities at the naval base. Like the DEIS, the FEIS also does not assess the added risk of explosions and environmental contamination associated with doubling the number of operational days at the explosives handling wharfs.

101.     The FEIS cumulative impacts analysis fails to assess impacts of the new wharf, along with several other large overwater structures along the Bangor shoreline, on salmonid migration and use of nearshore and adjacent marine waters. The FEIS cumulative impacts analysis also fails to discuss the cumulative impacts on lost treaty fishing areas directly caused by construction and operation of the new wharf and fails to analyze the effectiveness of any treaty mitigation measures in connection to the impacts from the new wharf.

102.     With respect to alternatives, the FEIS reveals that the Navy calculated the 400-operational-day requirement in 2008, prior to the public scoping period, and memorialized its conclusions in a document titled "*Explosives Handling Wharf-2 Business Case Analysis & Risk Assessment* (November 6, 2008)" (herein the "Business Case Analysis"). The Business Case Analysis was not included in any appendix to the FEIS: it has been withheld from public disclosure because it allegedly contains classified information. The Business Case Analysis was

COMPLAINT FOR DECLARATORY          Page 26
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1   created in connection with the DEIS and contains material substantiating claims fundamental to

2   the Navy's analysis.

3        103.   The alternatives discussed in the Business Case Analysis are summarized by the

4   FEIS. The FEIS does not, however, explore these alternatives in detail and continues to contain a

5   detailed discussion of only four nearly identical alternatives and the "no action" alternative. Each

6   alternative discussed in detail in the FEIS continues to provide the Navy with more operational

7   days than the Navy claims it needs.

8        104.   According to the FEIS, the Business Case Analysis considers several alternatives

9   that show the new wharf is necessary. The FEIS does not state whether these alternatives include

10  an expanded new wharf that might allow demolition of the existing wharf, nor whether this

11  alternative would be infeasible.

12       105.   Contrary to claims in the FEIS that the Business Case Analysis cannot be made

13  publicly available, the Navy released excerpts of the Business Case Analysis pursuant to a public

14  records request submitted by a third party.

15       106.   All of the alternatives in the excerpts of the Business Case Analysis involve

16  retaining the existing explosives handling wharf.

17       107.   The portions of the Business Case Analysis released to the public do not consider

18  the possibility of demolishing the existing wharf or building an expanded new wharf. The

19  excerpts of the Business Case Analysis also contain insufficient information to conclude that the

20  new wharf is necessary to meet the Navy's needs.

21       108.   Like the DEIS, the FEIS does not publicly disseminate Appendices A, B, or C. In

22  response to comments, the Navy explained that this was because "Department of Defense

23

COMPLAINT FOR DECLARATORY          Page 27
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1 | Unclassified Controlled Nuclear Information" is "classified," citing 40 C.F.R. § 1507.3.

2 | However, "Unclassified Controlled Nuclear Information" is not classified.

3 |     109.   In the FEIS, the Navy claims that it considered building an expanded and larger

4 | new wharf, but determined that this alternative would not allow the Navy to demolish the

5 | existing wharf. The Navy cites two sections of the FEIS as evidence that it considered this

6 | alternative. Neither of those sections nor any other section of the FEIS discuss the possibility of

7 | an expanded or larger new wharf. Thus, there is no evidence in the FEIS that the Navy actually

8 | considered this alternative.

9 |     110.   In the response to comments, the Navy also rejects a smaller over-all design for

10 | the new wharf more similar to the existing wharf. The Navy cites a document titled "*Facility*

11 | *Design Criteria for the P-990 Explosives Handling Wharf Number 2 (Covered) (Lockheed*

12 | *Martin 2010)*" for its inability to build a smaller wharf, explaining this document is "more

13 | restrictive than codes in place when the existing [wharf] was built." The Navy does not indicate

14 | why this document is binding on the Navy or, if it is binding, why the Navy could not alter its

15 | own code.

16 |     111.   The FEIS explains that the new wharf cannot be located on the East Coast without

17 | sacrificing "critical mission requirements." The FEIS does not identify these requirements nor

18 | link these requirements to the purpose and need for the new wharf.

19 | ***The Navy's Record of Decision***

20 |     112.   On May 4, 2012 defendant Robert M. Natsuhara, Principal Assistant Secretary of

21 | the Navy, signed a record of decision ("ROD") for the proposed new wharf. The Navy's ROD

22 | consummated the Navy's decision-making process and represents final agency action within the

23 | meaning of the APA.

COMPLAINT FOR DECLARATORY     Page 28
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

113.    While the Navy's ROD constituted final action within the meaning of the APA, it did not authorize construction of the proposed wharf. To construct the new wharf, the Navy was required to obtain permits from the Corps of Engineers under the RHA and CWA §404 authorizing the placement of pilings and fill material in the waters of the United States. The Corps did not issue these permits until August 21, 2012.

114.    The Navy's ROD did not adopt the mitigation measures recommended by the Suquamish Tribe for protection of the environment, including a shortened in-water work period to avoid impacts to ESA-listed salmonids, nor explain why the recommended mitigation measures were not adopted.

115.    The Navy released its ROD to the public on May 18, 2012.

116.    Congress did not authorize the Navy to abrogate the Suquamish Tribe's access to usual and accustomed fishing grounds along the Naval Base Kitsap shoreline through construction of the new wharf for 50 years.

### The NMFS Biological Opinion

117.    On September 29, 2011, Defendant Will Steele, Regional Administrator of NMFS, signed and issued the Biological Opinion ("BiOp") for the proposed new wharf, concluding that construction and operation of the new wharf will not jeopardize the continued existence of any ESA-listed salmonids or rockfish and is not likely to adversely modify designated critical habitat for ESA-listed salmonids. The BiOp relies on information provided in a biological assessment submitted by the Navy in February of 2011. As indicated below, the BiOp's conclusions are inaccurate, inconsistent, and unsupported by the evidence before the Agency.

COMPLAINT FOR DECLARATORY          Page 29
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

118.     The "action area" defined in the BiOp does not include the off-Naval Base component of the eastern shore of the drift cell in Hood Canal where ESA-listed species critical habitat is designated. Direct and indirect effects from the project will occur in this excluded portion of the drift cell.  Under the ESA, this portion of the drift cell must be included within the action area of the project. The BiOp, however, excluded the eastern shore of the drift cell from the action area, and did not consider the direct and indirect effects occurring in the eastern portion of the drift cell on the species. The BiOp therefore underestimates the impact of the project on the survival and recovery of the listed species, as well as on designated critical habitat.

119.     The environmental baseline section of the BiOp fails to contain an analysis of the collective effects of past and ongoing human and natural factors that have led to the current status of the species or its critical habitat within the action area. For example, the BiOp omits scientific information contained in the Recovery Plan for Hood Canal Summer Chum (the "Recovery Plan"), adopted by NMFS on May 24, 2007. *See* 72 Fed. Reg. 29121 (May 24, 2007). The environmental baseline discussed in the BiOp contains no consideration of the factors identified in the Recovery Plan that are contributing to the decline of summer chum salmon along the shoreline where the action will occur.

120.     The BiOp's erroneous action area leads to an incomplete and inadequate analysis of the direct, indirect, and cumulative effects of the new wharf and undermines NMFS's no jeopardy and critical habitat determinations.

121.     In addition, the BiOp contains several inconsistent and inaccurate statements, includes conclusions not supported by reference to any authority, and ignores relevant scientific information. These defects include the following:

COMPLAINT FOR DECLARATORY          Page 30
AND INJUNCTIVE RELIEF

a.      In the "Effects on Listed Fish" section of the BiOp, NMFS states that "[j]uvenile HCSR chum salmon *will not be present* in the action area during the in-water work window." Earlier in the BiOp, NMFS reaches the opposite conclusion: "[j]uvenile HCSR chum salmon *are expected to occur* at NBK Bangor from January through early April," within the in-water work window.

b.      The BiOp concludes that "adult salmonids," including summer-run chum salmon, "*don't use nearshore habitat* in the action area and therefore would have less opportunity for exposure to the highest, most injurious underwater sound levels." The BiOp does not disclose that adult summer-run chum salmon use nearshore habitat exclusively during their return migration (August-October) when in-water work is allowed. The statement in the BiOp also contradicts the Navy's FEIS, which concludes that adult summer-run chum salmon are at an increased risk of injury from construction noise.

c.      The BiOp concludes that "rockfish losses *will be limited to the larval life stage* and will be few in number." Earlier in the BiOp, NMFS concludes that "*juvenile and sub-adult* canary rockfish and bocaccio" may use kelp beds along the Naval Base Kitsap shoreline. Kelp beds are located immediately adjacent to the project site.   NMFS does not explain why juveniles and adults will not be injured or killed.

d.      In several places the BiOp concludes that juvenile and adult Chinook will not be impacted because those individuals do not use nearshore habitat. Only a small fraction of the project will be located in this nearshore area; the majority of construction will take place in waters 60 to 100 feet deep.  Chinook move into these deeper waters as

COMPLAINT FOR DECLARATORY       Page 31
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

they grow larger. The BiOp does not explain why juvenile and adult Chinook will not be harmed by high decibel noise in these deeper, offshore waters.

122.    The contradictions and misinformation described above significantly undermine the basis of NMFS' no-jeopardy conclusion in the BiOp. For example, in the "Integration and Synthesis" portion of the BiOp, NMFS justifies its no-jeopardy conclusion by citing the allegedly low number of ESA-listed salmonids present during the in-water work window. However, NMFS cannot accurately assess the number of salmonids present during the in-water work window without resolving the issue of whether juvenile and/or adult summer-run chum will be migrating along the shorelines of Hood Canal during that time. Similarly, despite its earlier acknowledgement that juvenile and sub-adult rockfish may be present during the in-water work window, NMFS bases its no-jeopardy conclusion for rockfish species on the fact that only larval rockfish will be harmed.

123.    Finally, the BiOp does not make an individualized no-jeopardy determination for each listed species. Nor does the BiOp explain why the individual species will be impacted to the same degree given differences in species health and abundance. For example, the BiOp does not explain why the endangered bocaccio will be impacted to the same degree as other, less imperiled species.

### *Permits Under the RHA and CWA § 404*

124.    On August 21, 2012, the Corps of Engineers issued a Department of the Army Permit authorizing construction of the new wharf under the RHA and CWA § 404. The permit authorizes the Navy to install up to 1,250 pilings for the new wharf and to place fill material within the waters of Hood Canal and the Suquamish Tribe's usual and accustomed fishing

COMPLAINT FOR DECLARATORY        Page 32
AND INJUNCTIVE RELIEF

1    grounds. The permit was signed by defendants Colonel Bruce A. Estok and Captain Peter M.

2    Dawson.

3         125.    On August 21, 2012, the Corps also released its record of decision for the CWA

4    and RHA permit. The Corps' ROD was signed by defendant Colonel Bruce A. Estok.

5         126.    On June 15, 2012, the Suquamish Tribe submitted exhibits and testimony to the

6    Corps for consideration during the CWA and RHA permitting process. These exhibits and

7    testimony demonstrated that the location of the new wharf is within the Tribe's usual and

8    accustomed fishing grounds and that the new wharf will abrogate the Tribe's treaty rights,

9    without express authorization from Congress, and in violation of federal law. These exhibits

10   included declarations of tribal members who have used and would use the location of the new

11   wharf for fishing.

12        127.    In response to the Suquamish Tribe's comments, the Corps' ROD acknowledges

13   that the Tribe has usual and accustomed fishing grounds in the immediate vicinity of the new

14   wharf, and that the Treaty of Point Elliot protects those usual and accustomed fishing grounds.

15        128.    Despite the Suquamish Tribe's treaty rights, the permit authorizes the Navy to

16   further encroach upon the Tribe's treaty rights, prevents the Tribe from accessing its usual and

17   accustomed fishing grounds, and contravenes the public interest. Yet Congress did not expressly

18   authorize the Corps of Engineers to abridge or diminish the Suquamish Tribe's treaty rights by

19   issuing the permit and preventing access to the Tribe's usual and accustomed fishing grounds.

20        129.    The Tribe also submitted exhibits and testimony to the Corps demonstrating that

21   the new wharf will reduce populations of fish and shellfish both in the immediate vicinity of the

22   proposed new wharf, and in other areas of Hood Canal and Puget Sound. These impacts will

23

1  negatively affect the Tribe's ability to fish in other areas of Hood Canal and Puget Sound, away

2  from the immediate vicinity of the new wharf.

3      130.   Similarly, on June 20, 2012, the Suquamish Tribe submitted comments to the

4  Corps of Engineers concerning the Navy's May 2012 Compensatory Mitigation Plan. The

5  Tribe's comments demonstrated that the Navy's plan does not adequately address the impacts

6  arising from the new wharf and that the Navy's mitigation plan does not adequately mitigate for

7  those impacts that are identified.

8      131.   The Corps' ROD acknowledges that construction and operation of the new wharf

9  will impact tribal fisheries resources in Hood Canal, including the degradation of salmon runs

10  and habitat. To compensate for these impacts, the ROD approves the Navy's mitigation plan,

11  including use of an "in lieu fee" program whereby the Navy would obtain mitigation credits from

12  a third party to offset the impacts of the project.

13      132.   However, Congress did not authorize the Corps of Engineers to degrade tribal

14  fisheries resources, either with or without mitigation, as required by the Supremacy Clause, the

15  Fifth Amendment to the United States Constitution, and the Treaty of Point Elliot. Therefore, the

16  permit is illegal.

17                              **CLAIMS FOR RELIEF**

18      133.   The Suquamish Tribe incorporates by reference all of the preceding paragraphs

19  into each claim for relief below.

20                              **FIRST CLAIM FOR RELIEF**

21      **(Violation of the Suquamish Tribe's Rights under the Treaty of Point Elliott)**

22      134.   The actions of defendants Army Corps of Engineers and Navy threaten to and will

23  interfere with the Suquamish Tribe's treaty fishing rights as secured by the Treaty of Point Elliott

COMPLAINT FOR DECLARATORY          Page 34
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1  and the Supremacy Clause of the United States Constitution. Defendants are under a treaty

2  obligation not to interfere with the exercise of treaty fishing rights, including the right of access

3  to all usual and accustomed fishing grounds and stations.

4       135.    In particular, the Corps' issuance of permits under the RHA and CWA § 404, and

5  the Navy's subsequent construction of the new explosives handling wharf, will eliminate the

6  Suquamish Tribe's access to certain usual and accustomed fishing grounds, as secured by the

7  Treaty of Point Elliott. Construction and operation of the new wharf will also illegally reduce

8  fish and shellfish populations both within the immediate vicinity of the new wharf, as well as

9  elsewhere in Hood Canal and Puget Sound, adversely affecting the Tribe's ability to fish in

10  violation of the Treaty of Point Elliot.

11       136.    Defendants' actions are therefore arbitrary, capricious, and are not in accordance

12  with law as provided by the APA, 5 U.S.C. § 706(2)(A).

13                      **SECOND CLAIM FOR RELIEF**

14               **(Breach of Federal Trust Responsibility)**

15       137.    Defendant Corps of Engineers has breached its trust obligation to the Tribe by

16  issuing permits under the RHA and CWA § 404 authorizing the new wharf, which will

17  permanently eliminate the Tribe's ability to access certain usual and accustomed fishing grounds

18  and will illegally reduce fish and shellfish populations. Likewise, the Navy has breached its trust

19  responsibility to the Suquamish Tribe by approving of the new wharf.

20       138.    Defendants' actions are therefore arbitrary, capricious, and not in accordance with

21  law as provided by the APA, 5 U.S.C. § 706(2)(A).

22

23

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1

### THIRD CLAIM FOR RELIEF

2

#### (Due Process)

3     139.    In approving of the new explosives wharf, and in issuing permits under the RHA

4  and CWA § 404, the Corps of Engineers and the Navy threaten to eliminate the Suquamish

5  Tribe's right of access to certain usual and accustomed fishing grounds in violation of the Fifth

6  Amendment to the United States Constitution.

7     140.    Defendants' actions are therefore contrary to a constitutional right as provided by

8  the APA, 5 U.S.C. § 706(2)(B).

9

### FOURTH CLAIM FOR RELIEF

10

#### (Rivers and Harbors Act of 1899)

11     141.    Defendant Corps of Engineers exceeded its statutory authority under Section 10

12  of the RHA, 33 U.S.C. § 403, and the regulations promulgated thereunder, including 33 C.F.R.

13  §§ 320.4 (a) (1) and 320.4(g). By issuing permits that fail to adequately mitigate impacts to the

14  environment and that conflict with the Suquamish Tribe's treaty rights, the Corps has authorized

15  permits that contravene the public interest under 33 C.F.R § 320(a)(1). By issuing permits that

16  authorize injury to the Tribe's property, invasion of the Tribe's rights as secured by the Treaty of

17  Point Elliott, and federal laws, the Corps contravenes 40 C.F.R. § 320.4(g)  in violation of

18  federal law.

19     142.    The Corps' actions are therefore arbitrary, capricious, not in accordance with law,

20  and in excess of statutory jurisdiction and right, as provided by the APA, 5 U.S.C. § 706(2)(A) &

21  (B).

22

23

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF     Page 36     Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1
2

## FIFTH CLAIM FOR RELIEF

### (Clean Water Act Section 404)

3   143.   Defendant Corps of Engineers exceeded its statutory authority under CWA § 404,

4   33 U.S.C. § 1344, and the regulations promulgated thereunder, including 33 C.F.R. §§ 320.4 (a)

5   (1) and 320.4(g). By issuing permits that fail to adequately mitigate impacts to the environment

6   and that allow a conflict with the Suquamish Tribe's treaty rights, the Corps has authorized

7   permits that contravene the public interest under 33 C.F.R § 320(a)(1). By issuing permits that

8   authorize injury to the Tribe's property, invasion of the Tribe's rights as secured by the Treaty of

9   Point Elliott, and federal laws, the Corps contravenes 40 C.F.R. § 320.4 (g) and violates federal

10  law.

11  144.   The Corps' actions are therefore arbitrary, capricious, not in accordance with law,

12  and in excess of statutory jurisdiction and right, as provided by the APA, 5 U.S.C. § 706(2)(A) &

13  (B).

14

## SIXTH CLAIM FOR RELIEF

### (Violations of NEPA)

15
16

### *FIRST VIOLATION*

### (Direct and Indirect Effects)

17
18  145.   The Navy failed to take a "hard look" at direct and indirect environmental impacts

19  and the analysis in the FEIS is inadequate and in violation of 42 U.S.C. § 4332(2)(C); 40 C.F.R.

20  § 1502.16; 40 C.F.R. § 1508.8(a), (b); 40 C.F.R. § 1508.27, and 40 C.F.R. § 1502.24. The EIS

21  fails to include a reasonably thorough and accurate disclosure of the project's direct and indirect

22  impacts.

23

COMPLAINT FOR DECLARATORY          Page 37
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

146.    For example, the FEIS contains false and/or misleading statements regarding the actual risks posed to juvenile ESA-listed salmonids.

147.    The FEIS fails to disclose that juvenile ESA-listed salmonids will be disproportionately harmed by the proposed July 16 to February 15 in-water work window.

148.    The FEIS fails to analyze the impacts of pile driving on migratory routes of ESA-listed species and of displacing other species away from their preferred habitat.

149.    The FEIS fails to discuss the significance of impacts to ESA-listed salmonids, including the context of the impacts and the intensity of the impacts. The FEIS also inappropriately relies on the ESA procedural language of "may affect, likely to adversely affect" to describe impacts under NEPA.

150.    In addition to failing to adequately analyze construction impacts, the FEIS fails to adequately analyze and disclose risks posed by the operation of the new wharf, including but not limited to impacts on salmonid migration, risk of environmental contamination, and vessel traffic at the new wharf.

151.    The Navy's direct and indirect effects analysis is therefore arbitrary, capricious, and not in accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. § 706(2)(A).

### SECOND VIOLATION

### (Cumulative Effects)

152.    The FEIS cumulative impacts analysis is inadequate and in violation of 40 C.F.R. § 1502.16, 40 C.F.R. § 1508.7, 40 C.F.R. § 1508.25(a)(2), and 40 C.F.R. § 1508.25(c).

153.    For example, the FEIS cumulative impacts analysis relies on the 2004 Corps and Washington Department of Fish and Wildlife in-water work windows despite the fact that those

COMPLAINT FOR DECLARATORY          Page 38
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1  work windows do not represent best available science. The FEIS combines ESA-listed and non-

2  ESA-listed salmonids into the same analysis, thus diluting the expected impacts to ESA-listed

3  species. The FEIS also fails to disclose that ESA-listed salmonids will be disproportionately

4  impacted by the new explosives handling wharf.

5      154.   In addition, the FEIS cumulative impacts analysis fails to address lost tribal treaty

6  fishing areas directly caused by construction and operation of the new wharf.

7      155.   The FEIS also fails to discuss the effects of increased activities at the naval base

8  resulting from the simultaneous operation of two explosives handling wharves, including

9  increased vessel traffic and the risk of nuclear explosion and contamination.

10      156.   The Navy's cumulative effects analysis is therefore arbitrary, capricious, and not

11  in accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. §

12  706(2)(A).

13                          *THIRD VIOLATION*

14              **(Failure to Use Best Available Science)**

15      157.   The FEIS fails to use "Best Available Science," in other words, to insure

16  scientific integrity as required by 40 C.F.R. § 1502.24, in its analysis of environmental impacts

17  and mitigation measures.

18      158.   For example, the 2004 Corps and Washington Department of Fish and Wildlife

19  in-water work windows are based on incomplete and/or outdated information and do not reflect

20  current knowledge of ESA-species behavior near Naval Base Kitsap. The Navy's statistical

21  analysis of impacts to ESA-listed species also does not represent best available science.

22

23

COMPLAINT FOR DECLARATORY          Page 39
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

159.   The Navy's reliance on these work windows and statistical analysis are therefore arbitrary, capricious, and not in accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. § 706(2)(A).

## *FOURTH VIOLATION*

### (Mitigation)

160.   The FEIS analysis of mitigation measures is inadequate and in violation of 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14(f), 40 C.F.R. § 1502.16(h), 40 C.F.R. § 1503.4; and 40 C.F.R. § 1508.20. The Navy's ROD also fails to explain why adequate mitigation was not included in the Navy's approval, in violation of 40 C.F.R. § 1505.2.

161.   For example, the FEIS does not consider or analyze means to avoid impacts on adult summer-run chum salmon such as a shortened in-water work window. The FEIS does not consider measures to avoid impacts to juvenile ESA-listed salmonids that use the shoreline along Naval Base Kitsap between December and February 15. Nor does the FEIS consider monitoring for salmonids during the in-water work window.

162.   The FEIS does not account for the loss or alteration of salmonid and other fish habitat from the shading of the water column from the large overwater structure in deep water.

163.   Neither the FEIS nor the Navy's ROD provides a reasoned explanation for the Navy's decision not to adopt these and other mitigation measures. .

164.   The mitigation measures analyzed in the FEIS and adopted in the Navy's ROD are, therefore, arbitrary, capricious, and not in accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. § 706(2)(A).

COMPLAINT FOR DECLARATORY      Page 40
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1    165.   By failing to analyze these and other mitigation measures, the FEIS also fails to

2    discuss the adverse environmental effects which cannot be avoided, as required by 40 C.F.R.

3    1502.16.

4                              *FIFTH VIOLATION*

5                          **(Alternatives Analysis)**

6    166.   The alternatives analysis in the FEIS is inadequate and in violation 42 U.S.C. §

7    4332(2)(C), 40 C.F.R. § 1502.14, and 40 C.F.R. § 1503.4.

8    167.   The Navy's EIS failed to consider in detail several reasonable alternatives,

9    including an expanded new wharf or new addition to the existing wharf that would allow the

10   Navy to demolish the existing wharf; constructing the wharf on the East Coast; and constructing

11   a smaller over-all new wharf. The FEIS also fails to consider in detail the options purportedly

12   examined in the Business Case Analysis, including increased efficiencies at the existing wharf,

13   and the terminal concept.

14   168.   The Navy also failed to adequately respond to comments or otherwise provide a

15   reasoned explanation for the decision to exclude these alternatives from detailed consideration.

16   169.   The Navy's alternatives analysis is, therefore, arbitrary, capricious, and not in

17   accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. §

18   706(2)(A).

19                              *SIXTH VIOLATION*

20                          **(Purpose and Need)**

21   170.   NEPA requires every EIS to "briefly specify the underlying purpose and need to

22   which the agency is responding in proposing the alternatives including the proposed action." 40

23

COMPLAINT FOR DECLARATORY          Page 41
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1   C.F.R. § 1502.13. The statement of purpose and need may not be artificially narrow or limit

2   consideration to a single alternative or to a small set of virtually identical alternatives.

3       171.   The Navy's assertions that it requires 400 operational days and that the proposed

4   wharf is the minimum structure that can satisfy that need unreasonably and artificially narrow the

5   range of alternatives considered in the FEIS.

6       172.   The Navy's statement of purpose and need is also not supported by the Navy's

7   Business Case Analysis.

8       173.   The Navy's statement of purpose and need is, therefore, arbitrary, capricious, and

9   not in accordance with NEPA and implementing regulations, as provided by the APA, 5 U.S.C. §

10   706(2)(A).

11                         ***SEVENTH VIOLATION***

12                         **(Inadequate Appendices)**

13       174.   The appendices to the FEIS do not contain all information required by 40 C.F.R. §

14   1502.16 and 32 C.F.R. §.775.5(a)–(b), which require any document prepared by the Department

15   of the Navy in connection with NEPA, including information that substantiates any fundamental

16   analysis in the EIS,  to be included in an appendix.

17       175.   The appendices do not include the Business Case Analysis, which the Navy

18   prepared in connection with the DEIS and which substantiates critical claims regarding the

19   Navy's need for the new explosives handling wharf.

20       176.   Appendices A, B, and C do not contain "classified" information within the

21   meaning of 40 C.F.R. § 1507.3. Appendices A, B, and C were withheld from the public in

22   violation of 40 C.F.R. § 1502.18.

23

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Page 42

1    177.    The FEIS is, therefore, not in accordance with NEPA and implementing

2    regulations, as provided by the APA, 5 U.S.C. § 706(2)(A).

3    **SEVENTH CLAIM FOR RELIEF**

4    **(Endangered Species Act)**

5    178.    The ESA places a duty on NMFS to ensure that federal actions are not likely to

6    jeopardize listed species or result in the destruction or adverse modification of critical habitat.

7    16 U.S.C. § 1536(a)(2).

8    179.    The ESA's implementing regulations define jeopardy as "an appreciable

9    reduction in the likelihood of both survival and recovery of a species." 50 C.F.R. § 402.2.

10    180.    In meeting the duty to prevent jeopardy or prevent the destruction or adverse

11    modification of critical habitat, NMFS is required to consider the environmental baseline, 50

12    C.F.R. § 402.14 (g) (2) – (3); to use the "best scientific and commercial data available," 16

13    U.S.C. § 1536(a)(2); and may not ignore relevant scientific information; and must make a

14    reasoned decision about the impacts of a proposed action.

15    181.    In reaching its no-jeopardy conclusion and its conclusion of not likely to

16    adversely modify designated critical habitat for ESA-listed salmonids, NMFS ignored relevant

17    scientific information, made inconsistent findings, and made findings unsupported by

18    substantial evidence.

19    182.    NMFS also failed to include all affected areas within the "action area" in violation

20    of 40 C.F.R. § 402.02.

21    183.    NMFS's conclusion that the proposed new wharf is not likely to jeopardize the

22    ESA-listed species and is not likely to adversely modify designated critical habitat for ESA-

23    listed salmonids as discussed above was arbitrary, capricious, and not in accordance with

COMPLAINT FOR DECLARATORY          Page 43
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

1  Section 7(a)(2) of the ESA and implementing regulations, as provided by the APA,  5 U.S.C. §

2  706(2)(A).

3  **PRAYER FOR RELIEF**

4  WHEREFORE, the Suquamish Tribe prays for the following relief:

5  1.      Pursuant to the Suquamish Tribe's FIRST CLAIM FOR RELIEF (VIOLATION

6  OF TREATY RIGHTS):

7  a.      A declaratory judgment that the actions of defendants Corps of Engineers

8  and Navy have violated the Suquamish Tribe's fishing rights as secured by the Treaty of

9  Point Elliott and the Supremacy Clause of the Constitution.

10  b.      An order setting aside the Corps' permits under the RHA and CWA § 404

11  and the Navy's approval of the new wharf.

12  c.      An order enjoining defendants from taking any action in furtherance of the

13  construction, operation, or maintenance of the proposed new wharf.

14  2.      Pursuant to the Suquamish Tribe's SECOND CLAIM FOR RELIEF (BREACH

15  OF FEDERAL TRUST RESPONSIBILITY):

16  a.      A declaratory judgment that by approving the new wharf, defendants

17  Corps of Engineers and Navy have violated their trust obligations to the Suquamish

18  Tribe.

19  b.      An order setting aside the Corps' permits under the RHA and CWA § 404

20  and the Navy's approval of the new wharf.

21  c.      An order enjoining defendants from taking any action in furtherance of the

22  construction, operation, or maintenance of the proposed wharf

23

COMPLAINT FOR DECLARATORY          Page 44
AND INJUNCTIVE RELIEF

1    3.    Pursuant to the Suquamish Tribe's THIRD CLAIM FOR RELIEF (DUE

2    PROCESS):

3        a.    A declaratory judgment that by approving the new wharf, defendants

4    Corps of Engineers and Navy deprived the Suquamish Tribe of property rights secured by

5    the Fifth Amendment to the United States Constitution.

6        b.    An order setting aside the Corps' permits under the RHA and CWA § 404

7    and the Navy's approval of the new wharf.

8        c.    An order enjoining defendants from taking any action in furtherance of the

9    construction, operation, or maintenance of the proposed wharf

10    4.    Pursuant to the Suquamish Tribe's FOURTH CLAIM FOR RELIEF (RIVERS

11    AND HARBORS ACT):

12        a.    A declaratory judgment that by issuing a permit under the RHA for the

13    construction of the new wharf, defendant Corps of Engineers acted outside its statutory

14    authority and in contravention of regulations implementing the RHA.

15        b.    An order setting aside the Corps' permit under the RHA.

16        c.    An order enjoining the Corps from taking any action in furtherance of the

17    construction, operation, or maintenance of the proposed new wharf.

18    5.    Pursuant to the Suquamish Tribe's FIFTH CLAIM FOR RELIEF (CLEAN

19    WATER ACT § 404):

20        a.    A declaratory judgment that by issuing a permit under CWA § 404 for the

21    construction of the new wharf, defendant Corps of Engineers acted outside its statutory

22    authority and in contravention of regulations implementing the CWA.

23        b.    An order setting aside the Corps' permit under CWA §404.

COMPLAINT FOR DECLARATORY         Page 45
AND INJUNCTIVE RELIEF

1      c.      An order enjoining the Corps from taking any action in furtherance of the

2  construction, operation, or maintenance of the proposed wharf.

3      6.      Pursuant to the Suquamish Tribe's SIXTH CLAIM FOR RELIEF (VIOLATIONS

4  OF NEPA):

5      a.      A declaratory judgment that the Navy failed to meet its procedural duties

6  under NEPA and CEQ's implementing regulations, including failing to take a hard look

7  at direct and cumulative effects, failing to use best available science, failing to adequately

8  consider mitigation measures, failing to conduct a proper alternatives analysis, and failing

9  to include all necessary information in the appendices to the FEIS.

10     b.      An order enjoining the Navy from taking any action in furtherance of the

11 construction, operation, or maintenance of the proposed new wharf until the Navy has

12 complied with the requirements of NEPA.

13     7.      Pursuant to the Suquamish Tribe's SEVENTH CLAIM FOR RELIEF

14 (ENDANGERED SPECIES ACT):

15     a.      Declaring that NMFS's conclusion in the 2011 biological opinion that the

16 proposed new wharf will not jeopardize the continued existence of listed species was

17 arbitrary, capricious, and otherwise not in accordance with the law, under the APA, 5

18 U.S.C. § 706(a)(2);

19     b.      An order setting aside NMFS's 2011 biological opinion;

20     c.      An order enjoining defendants from taking any action in furtherance of the

21 construction, operation, or maintenance of the proposed new wharf until NMFS has

22 complied with the requirements of the ESA.

23

COMPLAINT FOR DECLARATORY        Page 46
AND INJUNCTIVE RELIEF

Office of Tribal Attorney
THE SUQUAMISH TRIBE
P.O. Box 498
Suquamish, WA 98392
(360) 598-3311  Fax (360) 598-4293

8.    An order awarding the Suquamish Tribe its reasonable attorneys fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

9.    Such further relief as this Court deems just and equitable.

DATED this 27th day of August, 2012

Respectfully Submitted,

s/ David Bricklin, WSBA #7583
s/ Julie K. Ainsworth-Taylor, WSBA #36777
Bricklin & Newman LLP
1001 4th Avenue
Suite 3303
Seattle, WA 98154
(206) 264-8600 Telephone
(206) 264-9300 Facsimile
bricklin@bnd-law.com
taylor@bnd-law.com
*Counsel for the Suquamish Tribe*


/s Melody L. Allen, WSBA #35084
/s James R. Bellis, WSBA # 29226
The Suquamish Tribe
18490 Suquamish Way
P.O. Box 498
Suquamish, WA 98392
*Counsel for the Suquamish Tribe*

COMPLAINT FOR DECLARATORY            Page 47
AND INJUNCTIVE RELIEF