1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GROUND ZERO CENTER FOR
NONVIOLENT ACTION,
WASHINGTON PHYSICIANS FOR
SOCIAL RESPONSIBILITY, and GLEN
S. MILNER,

           Plaintiffs,

and

THE SUQUAMISH TRIBE,

           Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
THE NAVY, et al.,

           Defendants.

Case Nos.: 12-cv-5537 and 12-cv-1455

ORDER DENYING PLAINTIFFS'
MOTIONS FOR PRELIMINARY
INJUNCTION

# I.   INTRODUCTION

Before the Court are Motions for Preliminary Injunction filed by the Suquamish Tribe and Ground Zero Center for Nonviolent Action.  Case Nos. 12-cv-1455, Dkt. # 15; No. 12-cv-5537, Dkt. # 19.  Plaintiffs seek to enjoin the United States Navy from constructing a second explosives handling wharf ("EHW-2") at Naval Base Kitsap in Bangor, Washington.  The existing explosives handling wharf ("EHW-1") requires increasing maintenance, and the Navy concluded that a second wharf is needed to meet the basic requirements of the Trident ballistic-missile program.

Plaintiffs challenge the Navy's decision to build the second wharf under the National Environmental Policy Act ("NEPA"), arguing that the Navy wrongly withheld certain information, that the Navy failed to consider a wide enough range of alternatives, that the Navy failed to fully discuss efforts at mitigating harm to protected species, and that the Navy's environmental analysis masks harm to salmon.  The Suquamish Tribe further argues that the proposed wharf abrogates fishing rights secured to them by treaty and violates the Endangered Species Act ("ESA").

For the reasons set forth below, Plaintiffs' motions are denied.

# II.   FACTUAL BACKGROUND

## A.  The Trident Program and Explosive Handling Wharfs

The U.S. Navy's Trident program is a sea-based deterrent missile system.  Decl. of Rear Adm. Terry J. Benedict ¶ 3, Dkt. #28-3.  The Trident II fleet ballistic missile is a "submarine-launched ballistic missile that can be armed with nuclear warheads." *Id*.  Unsurprisingly, Trident missiles and submarines require specialized facilities, including the explosive handling wharfs at issue here. *Id.*  "The adequacy of the Trident Support Facilities is a matter of significant

importance to national security.  This is particularly true for the EHWs because the Navy must

frequently move the Trident II missiles on and off of the submarines . . . ."  *Id.* at ¶ 13.  The

wharfs allow the Navy to conduct maintenance and upgrades to the submarines.  *Id.*  Bangor

currently has one explosive handling wharf.

  The current wharf operates continuously during the year, less 60 days allotted for

maintenance (and other limiting factors).  *Id.* at ¶ 17.  This period—one year minus 60 days—

constitutes the wharf's "operational capacity."  *Id.*  Until recently, the EHW-1 met the Navy's

needs.

  In the 1990s, the Navy began using a new type of missile: the Trident II D5.  EIS at 1-5.

The D5 "is larger, more complex, and requires more time to handle and maintain than the

[previous missiles]."  *Id.* at 1-6.  Thus, the Navy started the "D5 Life Extension Program" in

order to upgrade the missiles—particularly their electronics—as they become "technologically

obsolescent."  *Id.*  As the missiles age, upgrades and maintenance naturally will become more

frequent—necessitating increasing use of the explosives handling wharf.  *Id.*

  Like the missiles, the existing wharf needs increasing maintenance, including

replacement of its piles.  EIS at 1-6.  It cannot, of course, be used during much of the

construction period, and the wharf's operational capacity will thus decline.  Benedict Decl. at

¶ 21.  Indeed, the Navy expects EHW-1's operational capacity to decline so much as to create an

"operational shortfall," which "represents a risk to the operability, reliability, safety, and security

of the Trident II system, and ultimately, to national security."  *Id.* at ¶ 18.  During the repair

period, the existing wharf will be available only 185 days per year. EIS at 1-6.  But, due to the

D5 Life Extension Program, the Navy has determined a need for 400 operational days.  *Id.*  Thus,

even after repairs to EHW-1 are complete, the existing wharf will ***still*** be unable to meet the

Navy's needs. Without a second wharf—EHW-2—the Navy argues that it will "become increasingly unable to manage the risks associated with the operational shortfall."  Benedict Decl. at ¶ 19.

In short, facing the need for 400 operating days, the Navy concluded that a second explosive handling wharf was necessary.

**B.  The Navy's Environmental Review Process**

Before obtaining a permit to build the EHW-2, the Navy conducted an environmental review, as required by NEPA, the Clean Water Act, the Endangered Species Act, the Marine Mammal Protection Act, and the Coastal Zone Management Act.  Defs.' Resp. at 3, Dkt. #28; EHW61669.[1]  The environmental review commenced with a notice of intent to prepare an EIS published on May 15, 2009.  EHW61668.

As part of the environmental review, the Navy conducted a biological assessment to analyze the effects of EHW-2 on several ESA-listed species.  EHW47377-560.  The Navy determined that the second wharf  "was likely to adversely affect" ESA-listed species, and thus, it requested that the National Marine Fisheries Service prepare a biological opinion ("BiOp").  EHW47388.  On September 29, 2011, the Fisheries Service issued its BiOp and incidental take statement, concluding that the proposed wharf would not affect the population viability of the ESA-listed salmon species (despite some injury or death to individual fish), and therefore, the species would not be jeopardized.  EHW57359-360.

---

[1] References to pages marked in the form EHW 00000 are citations to the administrative record produced by the Navy and on file with the Court.  (Dkts. #25; 33; 42; 52).  Due to the volume of documents produced for these motions and the different citation styles selected by the parties, the Court will sometimes cite directly to certain documents (specifically, the Navy's environmental impact statement ("EIS")) and sometimes to the parties' bates numbers.

1      In February 2011, although the Navy had not yet completed its EIS, it requested $715

2 million from Congress to build a second wharf.  Ground Zero's Mot. for Prelim. Inj. at 2, Dkt.

3 #19.

4      On March 18, 2011, the Navy circulated a draft-EIS for public comment.  EHW61668-

5 669.  The draft disclosed that the Navy intended to install 1,250 steel pilings and that the wharf

6 would cover 6.3 acres of water and extend 600 feet from the shoreline.  *See* Tribe's Mot. for

7 Prelim. Inj. at 3, Dkt. #15.  Among other considerations, the draft-EIS explored the effects of

8 underwater construction noise and the presence of the wharf on ESA-listed species.  *See id.*  On

9 October 3, 2011, the Navy released a supplement to the draft-EIS for public comment.

10 EHW61669.

11      The Navy published a notice of availability of the final EIS on March 30, 2012.  77 Fed.

12 Reg. 19281 (Mar. 30, 2012).  A record of decision was issued on May 4, 2012, and published on

13 May 18, 2012.  EHW65073-65097; Notice of Availability of EHW-2 R.O.D., 77 Fed. Reg.

14 29620 (May 18, 2012).

15      In the EIS, the Navy examined (among other things) the effects of underwater

16 construction noise on marine mammals, birds, and fish, the effects on food sources, and the

17 effects on traffic near Bangor.  *See generally* EIS at *x–xvi*.  The EIS disclosed that underwater

18 construction noise may cause levels of sound injurious to fish.  *See, e.g.*, EIS at 3.4.2.7.  The

19 Navy also considered mitigation measures to reduce potential damage caused by construction,

20 including: (1) efforts to protect marine water quality and seafloor during construction; (2) a

21 limited in-water work window; (3) efforts to protect upland water quality during construction;

22 (4) efforts to protect water quality during operation; (5) noise attenuation techniques during

23 construction; (6) monitoring noise impacts; and (7) mitigation measures for biological, cultural,

24

and other resources. *See* EIS, App. F at 19 (summarizing mitigation plan).  Additional mitigation measures include limiting the use of impact hammering, which creates higher levels of injurious sound, and a "soft-start approach for . . .  pile driving to provide a warning to fish prior to the drivers operating at full capacity."  Defs.' Resp. at 24, Dkt. #28; EHW 47408, 47410-411.

Additionally, the Navy considered five alternative forms for the new wharf: (1) a combined trestle with large pile wharf (the preferred alternative); (2) a combined trestle with conventional pile wharf; (3) separate trestles with large pile wharf; (4) separate trestles with conventional pile wharf; and (5) a combined trestle with floating wharf.  EIS at 2-3.

The Navy identified these alternatives based upon: (1) their capability of meeting Trident mission requirements; (2) the ability to avoid or minimize environmental consequences; (3) siting requirements, including proximity to existing infrastructure; (4) the availability of waterfront property; (5) the ability to construct essential project features; and (6) master planning issues, such as explosive safety restrictions.  EIS at 2-1.  The Navy also considered a "no-action alternative," but as outlined above, the Navy argues that the need for increased operational days mandates action.

**C.  Construction Plans for EHW-2**

Plans for the second wharf were detailed in the EIS.  EIS Fig. 2-2; EHW 61680.  The EHW-2 would be located 600 feet offshore in water 60–100 feet deep.  EHW 61679.  The wharf would consist of a launch wharf and a warping wharf extending from the main wharf to line up submarines and provide a safety barrier between a submarine and EHW-1.  LaPlatney Decl. at 6, Dkt. # 38; EHW 61680.

Construction of EHW-2 is scheduled between September 2012 and January 2016.  *Id.* at 3.  Offshore construction would include installation of piles using hammers and pile drivers. EIS

at 2-6.  The Navy estimates that less than 1,000 impact strikes a day are likely necessary to complete the project; but a less likely—but possible—scenario would result in up to 6,400 impacts per day.  *Id*.  To minimize potential damage caused by the underwater noise of pile driving, the Navy would limit certain in-water work to between July 16th and February 15th.[2] EIS at 3.19.2.1.1.  Pile driving would also be limited to daytime: striking could not begin until two hours after sunrise and would end two hours before sunset to avoid harm to foraging species.  Decl. of CPT LaPlatney at 9.[3]

The Navy states that it has carefully planned the construction in order to have the second wharf operational by its deadline—October 2016.  LaPlatney Decl. at 7; Benedict Decl. ¶ 19.  At that time, the Navy expects a significant operational shortfall: "In 2016, the projected operational need nearly doubles, substantially increasing the operational shortfall."  Benedict Decl.  ¶ 19.  That shortfall, the Navy states, "will have negative impacts to the operability, reliability, safety and security of the Trident II System, eventually reaching a point that they will pose a significant risk to national security."  *Id*. ¶ 49.

The construction schedule is further complicated by environmental concerns, ongoing operations at Bangor, and space limitations.  "The available space at the project location physically limits the amount of construction equipment that can safely operate at the site at any one time."  LaPlatney Decl. at 12.  Further restrictions, such as the shortened work-window and a cap on daily pile-strikes, limit the number of piles which can be installed each day and increase the risk of potential delay.  *Id*. at 8.  The Navy argues that delay to any part of the construction schedule may delay all construction that follows.  *Id*. at 18.

---

[2] Except in 2012, when in-water work will not start until the commencement of the project on Sept. 27.
[3] Construction is generally limited to between 7:00 AM and 10:00 PM to avoid exceeding airborne noise limits established in Wash. Admin. Code § 173-60-040.  Decl. of CPT LaPlatney at 9.

**D.  The Suquamish Tribe's Treaty Rights**

The Treaty of Point Elliot, to which the Suquamish are signatory, reserved tribal fishing rights at the Suquamish's "usual and accustomed" fishing grounds.  Tribe's Mot. for Prelim. Inj. at 2, Dkt. #15.  Included in the Tribe's fishing grounds are waters within Hood Canal and the proposed site of the second wharf.  *Id*.  Additionally, construction of the second wharf will cause noise that will impact fish running to other areas of the Tribe's fishing waters outside Hood Canal.  *Id*.

The Tribe's rights south of the Hood Canal bridge are, however, secondary to the rights of the Skokomish Tribe.  Defs.' Resp. at 7, Dkt. #38.  The Skokomish must therefore invite the Suquamish before the latter may fish south of the Hood Canal bridge.  *Id*.  The Skokomish have not extended such an invitation since the Ninth Circuit settled the issue in 1985—28 years ago. *Id*.; *see U.S. v. Washington*, 764 F.2d 670 (9th Cir. 1985).  Additionally, ***no*** tribe has access to waters near the existing wharf or the planned wharf without the permission of the Bangor Base Commander.  *Id*. at 9; 33 C.F.R. § 334.1220.

**E.  The Present Motions**

The Suquamish Tribe and Ground Zero both moved to enjoin construction of the second explosives handling wharf, the EHW-2.  Their arguments are somewhat, but not entirely, overlapping.

**1.  Ground Zero's Arguments**

Ground Zero argues that the Navy withheld information crucial to the public review process, information which should have been disclosed under NEPA.  Ground Zero's Mot. for Prelim. Inj. at 16, Dkt. #19.  This information includes five documents: Appendices A, B, and C to the EIS, the Facility Design Criteria, and the Business Case Analysis.  Ground Zero's Reply at

9, Dkt. #32.  The Navy withheld all three Appendices and the Facility Design Criteria as unclassified controlled nuclear information ("UCNI") and withheld the Business Case Analysis as classified.  Defs.' Resp. at 12, Dkt. #28.  The Navy withheld these documents during the NEPA process, but released redacted appendices during this litigation.  *See* Defs.' Supp. Opp. at 1, Dkt. #46.  The Court has reviewed the unredacted documents *in camera*.

Appendix A is six pages long and discusses the Navy's need for an additional wharf.  Defs.' Supp. Opp. at 3, Dkt. #46.  Most of the information was disclosed in both the draft and final EISs.  The Navy withheld, however, portions of Appendix A that discuss the "risks associated with the lack of capacity" at the existing wharf, as well as the "specific steps that the Navy is taking to manage those risks," including methods of missile handling and staffing decisions.  *Id.* at 4.

Appendix B outlines alternatives that the Navy considered "but that were not carried forward for additional analysis."  *Id.*  The Navy argues that the draft and final EISs summarized Appendix B, which contains only additional information on such alternatives as expediting repairs at the existing wharf, relocating submarines, and modifying facilities.  *Id.* at 5.  In essence, Appendix B contains alternatives that the Navy found so unreasonable as to require no further consideration.

Appendix C "contains explosives safety arcs" for both the existing and proposed wharfs.  *Id.* at 5; *see also* EHW 75424-21.  The risk of explosion arises from missile fuel.  EIS at 3.26-4.  The Navy disclosed only one paragraph, which "describes the safety arcs in general terms."  Defs.' Supp. Opp. at 6.  It argues that the undisclosed portion of Appendix C "cannot be disclosed."  *Id.*  Concerning the explosives risks, the EIS states that "[o]perations at the EHW-2 would be no different from operations at the existing EHW."  EIS at 3.26-4.  Ground Zero

1  stresses that the Navy failed to disclose that the Department of Defense's Explosive Safety Board

2  "did not accept safety risks associated with proposed separation between EHW-1 and proposed

3  EHW-2."  Ground Zero's Reply at 3, Dkt. #34 (quoting EHW-0075245).  The Department of

4  Defense granted a conditional site approval.  EHW-0075245.  Further, the Navy argues that

5  disclosure of the explosive safety arc information presents a non-justiciable issue.

6       The Facility Design Criteria is a document commissioned by the Navy and drafted by

7  Lockheed Martin that specifies certain design necessities of the proposed wharf.  *See* EIS at 2-3.

8  The Design Criteria includes "facility support" such as lightning towers, cranes, utility booms,

9  access trestles, and other necessities of an explosive handling wharf.  *Id.*  Ground Zero argues

10 that the Design Criteria is "cited as the reason for certain environmentally significant project

11 features" and should have been disclosed.  Ground Zero's Mot. for Prelim. Inj. at 9, Dkt. #19.

12 For example, Ground Zero notes that the Design Criteria precluded the use of grating, which

13 would allow "more light for the benefit of marine life,"[4] and the Criteria "control the width of the

14 wharf trestles and the size of the support building."[5]  *Id.*

15      The Business Case Analysis represents the Navy's assessment of "future Trident program

16 needs."  EIS at 1-5.  The EIS presents the conclusions of the Case Analysis, explaining that the

17 Navy requires explosive handling wharves with 400 operational days per year "due to changing

18 operational and weapons system requirements"—i.e., the D5 Life Extension Program.  *Id.*  The

19 EIS further explains the limited capacity of the existing wharf and the timetable within which the

20 Navy must fix the operational shortfall.  *Id.* at 1-5 through 1-7.

21

22

---

23 [4] The EIS states that grating was rejected because it would be ineffective given the weight and thickness that would be required.  EIS at 2-5.

24 [5] The EIS notes that trestles are the minimum width allowable by the Facility Design Criteria.  EIS at 2-27.

1   Lastly, Ground Zero argues that the NEPA process was deficient because the Navy

2   predetermined the outcome, and the Navy failed to adequately analyze reasonable alternatives,

3   mitigation measures, or the possibility of a severe impact.  *Id*. at 20–22.

4   **2.  The Suquamish Tribe's Arguments**

5   The Tribe argues that construction of the second wharf must be enjoined because the

6   construction and presence of the wharf will unlawfully abrogate or diminish tribal treaty rights.

7   Tribe's Mot. for Prelim. Inj. at 7, Dkt. #15.  The Tribe asserts that the Navy failed to adequately

8   consider the presence of ESA-listed salmon and that "the Navy's analysis under NEPA masks

9   the true impacts of the project."  *Id*. at 17.  Additionally, the Tribe argues that the EIS fails to

10  adequately disclose harm to certain salmon species.  *Id.* at 20.  Like Ground Zero, the Tribe

11  asserts that the EIS does not adequately discuss mitigation techniques or reasonable alternatives.

12  *Id.* at 21–22.  The Tribe also argues that the BiOp prepared by the Fisheries Service violates the

13  ESA by ignoring biological information and basing conclusions upon contradictory findings.  *Id.*

14  at 26.  Lastly, the Tribe argues that the Army Corps of Engineers should not have issued permits

15  under the Rivers and Harbors Act, 33 U.S.C. § 403, and under the Clean Water Act, 33 U.S.C. §

16  1344.  *Id.* at 1.

17  **III.   DISCUSSION**

18  A preliminary injunction is an extraordinary measure never awarded as of right.  *Winter*

19  *v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Green*, 553

20  U.S. 674, 690 (2008)).  "A preliminary injunction is an extraordinary and drastic remedy, one

21  that should not be granted unless the movant, *by a clear showing*, carries the burden of

22  persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).  Plaintiffs

23  seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a

24

likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Federal courts review agency decisions on an "arbitrary and capricious" standard under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375 (1989). An agency decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Northwest Environ. Defense Cntr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (internal citation omitted). If the agency fails to conform to the standards of the APA, a court may "hold unlawful and set aside any agency action, findings, and conclusions."[6] 5 U.S.C. § 706; *see also id.* Review is limited in scope, and a court "is not to substitute its judgment for that of the agency." *Motor Vehicles Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The relevant inquiry is whether the 'agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990) (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 981 (9th Cir. 1985)).

---

[6] Title 5 U.S.C. § 706(2) provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

A.   **Plaintiffs Have Not Shown a Likelihood of Success on the Merits**

To obtain a preliminary injunction, Plaintiffs must demonstrate a likelihood of success on the merits.  *Munaf*, 553 U.S. at 690.  Plaintiffs have failed to carry that burden.

### 1.  Plaintiffs Fail to Show that the Navy Wrongly Withheld Information from NEPA Review

Ground Zero asserts that the Navy failed to comply with NEPA by withholding Appendices A, B, and C, the Facility Design Criteria, and the Business Case Analysis.  They argue that late disclosure of portions of these documents proves the Navy improperly withheld the documents during the public-comment stage of the NEPA process.  Ground Zero's Reply at 12, Dkt. #13.

NEPA has "twin aims": to obligate federal agencies to consider "significant aspects of the environmental impact of a proposed action," and "to inform the public that [the agency] has indeed considered environmental concerns . . . ."  *San Luis Obispo Mothers for Peace ("SLOMP") v. Nuclear Regulatory Comm'n*, 635 F.3d 1109, 1115 (9th Cir. 2011) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).  The process grants the public and government officials the opportunity to participate before action on a project begins.  40 C.F.R. 1500.1(b).  NEPA allows the public to "play a role in both the decision making process and the implementation of that decision."  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA offers the public an opportunity to scrutinize an agency's action, which should be based upon "[a]ccurate scientific analysis [and] expert agency comments . . . ."  40 C.F.R. 1500.1(b). "Most important[ly], NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."  *Id.*

A federal agency must prepare an EIS for major actions "significantly affecting the quality of the human environment."  42 U.S.C. § 4332 (2)(C); 40 C.F.R.§ 1501.3.  A reviewing

1    court determines "whether an EIS contains a 'reasonably thorough discussion of the significant

2    aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761

3    (9th Cir. 1982) (citing *Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)).

4    Thus, a court must "make a pragmatic judgment whether the EIS's form, content and preparation

5    foster both informed decision-making and informed public participation." *Id*. (citing *Warm

6    Springs Dam Task Force v. Gribble*, 565 F.2d 552 (9th Cir. 1977)).  Under the "rule of reason"

7    standard, the "reviewing court [does not] substitute its judgment for that of the agency

8    concerning the wisdom or prudence of a proposed action.  Once satisfied that a proposing agency

9    has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Id*.

10   (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

11        NEPA's public-disclosure requirements are expressly governed by FOIA.  *Id*. (citing

12   *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981); 42 U.S.C. § 4332(2)(C)).

13   "In a given situation a federal agency might have to include environmental considerations in its

14   decisionmaking process, yet withhold public disclosure of any NEPA documents, in whole or in

15   part, under the authority of an FOIA exemption."  *Weinberger*, 454 U.S. at 143.  In this case,

16   there are two relevant FOIA exemptions.  Under 5 U.S.C. § 552(b)(1),[7] material classified as

17   secret in the interest of national security or foreign policy may be exempt from disclosure.

18   Under 5 U.S.C. § 552(b)(3), material specifically exempted by statute is also exempt from FOIA

19   requirements.  5 U.S.C. 552 (b)(3).[8]  Thus, under these two exemptions, an agency may satisfy

20

21   _____

22   [7] FOIA exempts materials "specifically authorized under criteria established by an Executive order to be kept in
     secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such
     Executive order."  5 U.S.C. § 552 (b)(1).

23   [8] FOIA does not apply to materials "specifically exempted from disclosure by statute if that statute—(A) (i) requires
     that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii)
     establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if

24   enacted after the date of the OPEN FOIA Act of 2009, specifically cites to this paragraph."  5 U.S.C. § 552(b)(3).

1   NEPA requirements even while withholding materials it relied on during the environmental

2   review.[9]  *See SLOMP*, 635 F.3d at 1116.

3                       **a.   Appendices A, B, and C, and the Facility Design Criteria**

4           Here, the Navy withheld the three Appendices and the Facility Design Criteria under

5   § 552(b)(3), because the Navy designated the documents as unclassified controlled nuclear

6   information—UCNI.  The Navy may designate information as UCNI and withhold that

7   information "as may be necessary to prohibit unauthorized dissemination . . . pertaining to

8   security measures, including security plans, procedures, and equipment for the physical

9   protection of special nuclear material."  10 U.S.C. § 128(a)(1).  Further, the Navy may withhold

10  information that "could reasonably be expected to have a significant adverse affect on . . . the

11  common defense and security by significantly increasing the likelihood of . . . theft, diversion, or

12  sabotage of special nuclear materials, equipment, or facilities."  10 U.S.C. § 128(a)(2).  Thus, if

13  the Navy properly designates information as unclassified controlled nuclear information, then

14  FOIA exempts that information from disclosure under NEPA.  5 U.S.C. § 552(b)(3).

15          The Supreme Court addressed precisely this issue in *Weinberger v. Catholic Action of*

16  *Hawaii/Peace Education Project*, 454 U.S. 139 (1981).  The Supreme Court held that the Navy

17  may properly withhold some information from disclosure under NEPA if exempt under FOIA—

18  specifically, nuclear information.  *Id.* at 203.  Furthermore, the Court stated that the issue is

19  beyond the judicial ken: "[P]ublic policy forbids maintenance of any suit in a court of justice, the

20  trial of which would inevitably lead to the disclosure of matters which the law itself regards as

21

22  _____

23  [9] Although an issue in this litigation has arisen regarding the Navy's inadvertent disclosure of certain documents,
    that does not affect whether or not the Navy was properly withholding such information during the environmental
    review process.  Inadvertent disclosure for purposes of litigating these motions does not demonstrate the Navy was
24  improper in its earlier withholding.

1    confidential, and respecting which it will not allow the confidence to be violated." *Id.* at 146

2    (quoting *Totten v. United States*, 92 U.S. 105, 107 (1876)).

3            The Court must conclude that the Navy properly designated the material as UCNI and

4    therefore properly withheld the Appendices and the Facility Design Criteria.  Appendix A

5    contains details on the "needs of the Navy's Trident program," including "the maintenance and

6    testing of weapons systems" and the "loading and offloading of missiles."  Defs.' Supp. Opp. at

7    3, Dkt. #46.  Courts must give "substantial weight" to executive-agency classification decisions,

8    and the Navy's treatment of Appendix A deserves such weight.  *Hunt v. CIA*, 981 F.2d 1116,

9    1119 (9th Cir. 1992); *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991).  The Navy properly

10   reasoned that disclosing the details of the maintenance and handling of nuclear missiles could

11   reasonably be expected to have a significant adverse affect on the common defense.

12           Moreover, the Court is unconvinced that withholding these materials is even significant.

13   Regarding Appendix A, both the draft and final EISs contain ample discussions of the need for a

14   new explosive-handling wharf—the need being operational shortfall.  The Court sees no point in

15   disclosing the details of weapons handling so that Plaintiffs may second guess the number of

16   days the Navy requires use of an explosive-handling wharf.  NEPA does not allow such

17   nitpicking.  *See Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997); *see also Gulf*

18   *Restoration Network v. U.S. Dept. of Transp.*, 452 F.3d 362, 367 (5th Cir. 2006) (noting that

19   courts should avoid "fly-specking").  Thus, the Navy's late disclosure of portions of Appendix A

20   had little, if any, effect on the public's ability to comment on the draft EIS.

21           The logic above applies equally to Appendices B and C and the Facility Design Criteria.

22   The Court has reviewed the documents *in camera*, and each contains information that, if

23   disclosed, could reasonably be expected to significantly and adversely affect national security.

24

1    But the withheld information is not essential to determining the environmental consequences of

2    building EHW-2.  The Court recognizes the obvious and recurring tension between NEPA's

3    disclosure mandate and the military's responsibility to keep sensitive information out of the

4    wrong hands.  But in this case, the Navy has shown that—although undisclosed—the

5    Appendices and the Facility Design Criteria were properly considered in the EIS.  In short, the

6    Navy correctly designated these documents as UCNI, and they are therefore exempt from

7    disclosure under NEPA.

8                            **b.  The Business Case Analysis**

9        Unlike the Appendices and the Facility Design Criteria, the Navy classified the Business

10   Case Analysis and withheld it under 5 U.S.C. § 552(b)(1).  The Case Analysis details the Trident

11   program and its future needs, and it is the Case Analysis in which the Navy concluded that a

12   second wharf was the only viable option.  Plaintiff Glen Milner obtained a non-classified portion

13   of the Case Analysis before publication of the final EIS, but Plaintiffs contend that some portion

14   should have been directly included.

15        Plaintiffs have presented the Court with no reason to question the Navy's decision to

16   classify the majority of the Case Analysis.  The Analysis necessarily outlines how the Navy

17   maintains its missiles, information that the Navy rightfully guards.  Moreover, the key

18   conclusion of the Analysis—that the Navy requires explosives handling wharves with 400

19   operational days—is fully discussed in both the draft and final EISs.  At this preliminary

20   juncture, Plaintiffs have not established a likelihood that the Navy violated NEPA by failing to

21   disclose the Case Analysis.

22        Lastly, the Court must note that there are pragmatic limits to a NEPA analysis.  Plaintiffs

23   appear to seek the Business Case Analysis so that they may investigate the 400 operational-day

24

requirement.  In other words, they seek to use NEPA to second guess the Navy's missile

maintenance program.  This is where the "rule of reason" must intervene.

NEPA mandates that a federal agency take a "hard look" at a decision's environmental

consequences.  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citing *Kleppe v. Sierra*

*Club*, 427 U.S. 390, 410 n.21 (1976)).  That hard look requires, of course, that an agency publish

the rationale behind its decision so that it may be weighed.  But, how far down the decision-

making rabbit-hole does NEPA allow a plaintiff to go?  Can Plaintiffs demand access to the

design specifications of a Trident submarine? The maintenance records of nuclear warheads?

The dates and times the Navy's fleet expects to be in port?  The rule of reason compels a court to

use common sense.  Here, the Court need not draw a line in the sand to see that Plaintiffs have

stepped over it.

In sum, the Navy determined it had a problem: it requires use of an explosives handling

wharf 400 operational days per year.  The Navy proposed solutions to that problem, and NEPA

mandates a hard look at the environmental consequences.  At this point, the Navy appears to

have taken that hard look.  And given that the Navy fully explained the reason it wants to build

EHW-2—to solve the operational shortfall—it does not appear that nondisclosure of the Case

Analysis would have had any effect on public input.

The Court therefore concludes that Plaintiffs have not established a likelihood that the

Navy violated NEPA by refusing to disclose the classified parts of the Case Analysis.

### 2.  Plaintiffs Have Failed to Establish that the Navy Predetermined the Outcome of the EIS

Ground Zero argues that the Navy's "NEPA process merely sought to justify a decision

already made."  Ground Zero's Mot. for Prelim. Inj. at 19, Dkt. #19.  Indeed, the Navy sought

funding for the project before completing the EIS.  *Id.*

1   NEPA prevents agencies from committing resources "prejudicing selection of

2   alternatives before making a final decision." 40 C.F.R. § 1502.2(f). A federal agency should

3   prepare a NEPA analysis "early enough so that it can serve practically as an important

4   contribution to the decisionmaking process and will not be used to rationalize or justify decisions

5   already made." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 892 (9th Cir. 2002)

6   (citation omitted). Thus, an agency must complete its NEPA analysis before making an

7   "***irreversible and irretrievable*** commitment of resources." *WildWest Inst. v. Bull*, 547 F.3d

8   1162, 1168 (9th Cir. 2008) (emphasis added).

9   Plaintiffs have failed to show that the Navy irreversibly and irretrievably committed

10  resources before finishing the EIS. The Navy's pursuit of funding is not a commitment of the

11  funds. If the Navy had entered contracts to build the second wharf, that might constitute an

12  irreversible commitment. For example, in *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), the

13  court of appeals held that the National Oceanic and Atmospheric Administration ("NOAA")

14  irreversibly committed resources by entering a formal agreement to support the Makah Tribe's

15  whaling permit. *Id.* at 1143–44. The agency did so before completing an environmental

16  assessment, and the court therefore ruled the assessment untimely. *Id.* There is no comparable

17  commitment of resources here. Seeking funding is not committing funds.

18  In short, the Navy did not take action that would adversely impact the environment, that

19  would limit reasonable alternatives, or would otherwise commit resources before completing the

20  EIS.

21  **3. Plaintiffs Have Not Established that the Navy Failed to Analyze**
    **Reasonable Alternatives**

22

23  Ground Zero argues that the "Navy stated inflexible goals for the project's location, size

    and capacity." Ground Zero's Mot. for Prelim. Inj. at 20, Dkt. #19. The Navy established

24

1  "narrow parameters" that "made it impossible for the public to consider anything but a second

2  EHW with admittedly excessive capacity in a spot dangerously close to the historic EHW . . . ."

3  *Id.*  The options, in other words, were "just slight variations of the same project."  Ground Zero

4  further argues that Navy improperly relegated the discussion of rejected alternatives to Appendix

5  B, which was not disclosed.  *Id.*

6       Similarly, the Suquamish Tribe asserts that the Navy improperly "declined to analyze in

7  detail the alternative of demolishing the existing wharf . . . ."  Tribe's Mot. for Prelim. Inj. at 23,

8  Dkt. #15.[10]

9       Providing a range of alternatives is "the heart of the environmental impact statement."  40

10  C.F.R. § 1502.14.  Agencies must "[r]igorously explore and objectively evaluate all reasonable

11  alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the

12  reasons . . . ."  *Id.* § 1502.14(a).  The agency cannot define its objectives in "unreasonably

13  narrow" terms so that "only one alternative from among the environmentally benign ones in the

14  agency's power would accomplish the goals . . . ."  *Nat'l Parks & Conservation Ass'n v. Bureau*

15  *of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1783 (2011)

16  (citation omitted).  Yet, agencies still "enjoy considerable discretion to define the purpose and

17  need of a project."  *Id.* (citing *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066

18  (9th Cir. 1998) (internal quotation omitted)).

19       The Navy intends to build the new wharf "to support future requirements for the eight

20  Trident submarines currently homeported at the Bangor waterfront and the Trident II (D5)

21  Strategic Weapons System."  EIS at 1-5.  As discussed above, the EIS outlines the Trident

22

23  [10] The Tribe additionally faults the Navy for failing to respond to the Port Gamble S'Klallam Tribe's "request to
consider a larger wharf . . . if that were necessary to allow removal of the old wharf."  Tribe's Mot. for Prelim. Inj. at

24  23, Dkt. #15.  The Court declines to address this argument in length for reasons obvious from the discussion below.

1    program, the use of explosives handling wharves, and the impending operational shortfall due to

2    the repairs that must be made to the existing wharf.  *See id*.  Without a new wharf at Bangor, the

3    Navy would have a severe lack of wharf capacity for a decade and a continuing, although less

4    severe, shortfall after that.  *See* EIS at 1-5 through 1-6 (explaining that the new wharf would

5    provide only 305 operational days even after the Navy completes repairs in 2024, well short of

6    the 400 needed).

7           The Court must conclude that Plaintiffs have failed to show a likelihood of success on the

8    merits.

9                                         **a.   Location**

10          It is true that the Navy presented no alternative to the Bangor location.  EIS at 2-32.  As

11   the EIS explains, Bangor is the ***only*** naval base on the west coast capable of supporting Trident

12   submarines.  *Id*.  The Navy rejected the idea of using King's Bay in Georgia to fill the

13   operational shortfall because even after the Navy completes repairs to the existing wharf in

14   Bangor, it will ***still*** have an operational shortfall.  It makes no sense for the Navy to use King's

15   Bay to simply dodge the Bangor problem as long as possible.  The Court has little trouble

16   accepting the Navy's decision not to shift maintenance of the Pacific fleet to ***a different ocean***.

17          Moreover, Plaintiffs have not offered any viable options the Navy failed to consider.  To

18   succeed on its claims, a plaintiff must offer "specific evidentiary facts" demonstrating that the

19   unconsidered alternatives were "reasonable and viable."  *City of Angoon v. Hodel*, 803 F.2d

20   1016, 1022 (9th Cir. 1986) (citing *Friends of the Earth v. Coleman*, 513 F.2d 295, 298 (9th Cir.

21   1975) (noting also that alternatives "must be ascertainable and reasonably within reach")).

22   Plaintiffs have not suggested another option; they merely scold the Navy for refusing to consider

23   an impossible scenario.

24

1   As for the location within Bangor, the Navy determined that the proposed site is the only

2   location that maintains the "required separation distances between facilities." Defs.' Opp. at 23,

3   Dkt. #28. Again, Plaintiffs present no other option or reason to dispute the Navy's conclusion.

### b.  Size and Capacity

5   Plaintiffs have failed to show that the Navy presented an unreasonably narrow range of

6   alternatives on the size and capacity of the proposed wharf. Ground Zero argues that the Navy

7   "evaluated alternative designs for the EHW-2, not alternatives to the EHW-2." Ground Zero's

8   Mot. for Prelim. Inj. at 5, Dkt. #19 (internal punctuation omitted). Further, the alternatives

9   contained a "long list of predetermined features," including the use of a main wharf and warping

10  wharf, lightening towers, heavy-duty cranes, a concrete shore-abutment, four new buildings, and

11  a new security fence. *Id.* at 6. Ground Zero speculates that the Navy should have considered

12  using the existing wharf "around the clock," "ending use of the existing EHW after building a

13  larger new EHW," and "shifting some operational days to Bangor's Delta Pier or Marginal

14  Wharf [or King's Bay]." *Id.* at 7. The Court disagrees.

15  The Navy did not unreasonably limit its alternatives. The EIS explains that a single

16  explosives-handling wharf can provide only 305 operational days (365 days per year minus 60

17  days for maintenance). EIS at 1-6. The Navy's D5 Life Extension Program requires 400

18  operational days. *Id.* Thus, "a single EHW cannot . . . meet Trident program requirements." *Id.*

19  Ground Zero's alternatives simply fail the math.

20  As for predetermined features, Ground Zero fails to explain why or how the Navy could

21  build an explosives handling wharf without these items. This Court has little expertise in wharf-

22  design, but it seems reasonable that all options would include lightening towers. It seems

23  reasonable that all options include a crane. How else does one move a missile?

24

1     Contrary to Ground Zero's arguments, the Navy appears to have presented five

2  reasonable alternatives to its selected design.[11]  It proposed different configurations of trestles

3  and pilings and an option for a floating wharf.  EIS at 2-3.  Ground Zero fails to address these

4  alternatives, explain why they are "unreasonably narrow," or suggest any "reasonable and

5  viable" option that the Navy failed to consider.  The size and "capacity"[12] of the second wharf

6  appears to be dictated largely by the size of Trident submarines and the work to be performed.  If

7  there is an argument that a smaller wharf is even possible, Plaintiffs have not raised it.

8     In short, there's only so many ways to build a wharf.  Plaintiffs have not suggested one

9  the Navy ignored.

10         **4.   Plaintiffs Have Failed to Establish a Likelihood of Success on the
             Merits Regarding Mitigation Measures**

11     The new wharf will indisputably affect the environment.  As both the Plaintiffs and the

12  Navy note, pile-driving may harm fish, marine mammals, and birds; the new wharf will displace

13  eelgrass and shellfish and create an obstacle to migrating salmon.  Ground Zero's Mot. for

14  Prelim. Inj. at 10, Dkt. #19; EIS at 5-1; Tribe's Mot. for Prelim. Inj. at 21, Dkt. #15.  The Navy

15  produced a 220-page appendix to the EIS, detailing its planned mitigation measures.  *See* EIS,

16  Appx. F.  In it, the Navy presents a number of actions designed to mitigate environmental harms.

17  Pile-driving will occur only between July 16th and February 15th, outside the primary salmon

18  runs.  EIS, App. F at 16–17.  The Navy intends to use primarily vibratory drivers and an

19  underwater bubble curtain to reduce noise.  *Id.*; EIS at *xv*.  A system of acoustic monitoring will

20  ensure that noise levels do not exceed targets.  *Id.*  Moreover, the majority of this work will be

21  done in the first year of construction.  EIS, App. F at 17.

22

23

24
[11] The five alternatives were presented in addition to the no-option alternative.
[12] The Court is unsure what Ground Zero means by "capacity."  Each wharf holds one submarine.

1    The EIS also contains a "compensatory aquatic mitigation" plan, meant to offset the

2  unavoidable damages caused by EHW-2.  *See* EIS, App. F.  The Navy considered a number of

3  options, but is proceeding to study restoration and conservation plans in Dabob Bay and Shine

4  Tidelands State Park.  *See id.* at 78.  Ground Zero highlights comments made by the EPA

5  regarding these two sites.  In an April 2012 letter, the EPA commended the Navy for changes

6  made to the draft EIS, but noted that Dabob Bay was "inappropriate for mitigation" because the

7  site is not "clearly at risk."  Ground Zero's Mot. for Prelim. Inj., Attach. 3, Dkt. #19-4 at 4.

8  Further, the EPA argued that while the Shine Tidelands site would compensate for loss of

9  wetlands, the Navy had not demonstrated how the site would compensate for loss of eelgrass,

10  macroalgae, and "other ecological processes."  *Id.*

11    NEPA requires agencies to "discuss potential mitigation measures in their EISs and

12  decision documents."  *Pacific Coast Fed. of Fisherman's Assocs. v. Blank*, 693 F.3d 1084, 1103

13  (9th Cir. 2012) (citing 40 C.F.R. §§ 1502.14(f), 1502.16(e)–(h), 1505.2(c), 1508.25(b)(3)).  An

14  EIS must discuss mitigation "in sufficient detail to ensure that environmental consequences have

15  been fairly evaluated."  *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

16  353 (1989)).  The discussion "necessarily includes an assessment of whether the proposed

17  mitigation measures can be effective."  *Id.* (citing *S. Fork Band Council of W. Shoshone of Nev.

18  v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009)).  Without a discussion of mitigation,

19  "neither the agency nor other interested groups and individuals can properly evaluate the severity

20  of the adverse effects."  *Robertson*, 490 U.S. at 352.  But importantly, NEPA contains no

21  substantive requirement "that a complete mitigation plan be actually formulated and adopted."

22  *Id.*

23

24

1    Here, the EIS explains how the adverse effects of the primary harm—pile driving—will

2    be attenuated by working outside the seasonal salmon runs, by noise monitoring, a bubble

3    curtain, and use of a vibratory hammer.  By limiting the work window, the Navy should avoid

4    virtually all damage to chum salmon and most damage to the winter-run chinook.  *See* Defs.'

5    Demonstrative Ex., Dkt. #68-1.  Indeed, less than 2% of juvenile chum run occurs during the

6    work window.  *Id*.  The EIS explains that the National Marine Fisheries Service will monitor

7    other species and enforce many of the mitigation measures.  *See, e.g.*, EIS, App. F. at 2-8.

8    At this juncture, the EPA's comments regarding Dabob Bay and Shine Tidelands are of

9    some concern, but alone are insufficient to warrant injunctive relief.

10    **5.   The Navy Did Not "Fail to Evaluate a Possible Severe Impact"**

11    Ground Zero argues that the "Navy utterly failed to explore the possibly catastrophic

12    results of an explosive attack or accident, even though documents obtained through FOIA

13    describe a risk that missiles at one EHW could detonate missiles at the other EHW . . . ."

14    Ground Zero's Mot. for Prelim. Inj. at 22, Dkt. #19.  In response, the Navy states that it has

15    considered the explosive hazard, including accident and terrorist attack, but the "analyses contain

16    sensitive information and cannot be publicly disclosed."  Defs.' Opp. at 25, Dkt. #28.  The

17    analysis at issue is contained in Appendix C, discussed above.

18    This point is easily resolvable: the Navy has analyzed the explosive hazard; indeed, it is

19    the explosive hazard that determines much of EHW-2's design.  The information, however, is

20    designated UCNI, and the Navy properly withheld it under FOIA.  *See* 5 U.S.C. 552(b)(3).

21    Again, this argument raises a difficult predicament: Plaintiffs cannot review the Navy's analysis

22    and challenge it under NEPA without disclosure.  But, NEPA does not guarantee access to

23    confidential materials.  *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981).

24

NEPA does mandate, however, that the Navy perform the environmental analysis, regardless of its disclosure.  *Id.*  After *in camera* review of Appendix C, the Court must conclude that Plaintiffs have failed to show a likelihood of a NEPA violation here.

### 6.   The Suquamish Tribe Fails to Show that Construction of the EHW-2 Abrogates Treaty Rights

The Tribe argues that the Corps of Engineers needs "specific and express congressional authority" to issue permits for the new wharf because the construction effectively abrogates its right to fish.  Tribe's Mot. for Prelim. Inj. at 8, Dkt. #15.  According to the Tribe, the Corps and the Navy have "mistakenly equate[d] . . . secondary fishing rights in the Bangor area to no rights at all."  *Id.* at 10.  In response, Defendants assert that the project will not affect either the Tribe's right to access or its right to take fish.  Defs.' Opp. at 7, Dkt. #38.  The Court must agree.

First, although the parties scarcely touch on the subject in briefing, Naval Base Kitsap is a restricted area—no one can fish there (absent permission of the base commander).  33 C.F.R. § 334.1220; *see also* EIS at 1-4 (map illustrating the restricted area and placement of the proposed wharf).  Thus, the actual space that the wharf will occupy is already off-limits.  The Tribe cannot lose access to a place to which it has no access.

Second, the Suquamish has secondary—not primary—rights to fish in Hood Canal.  This presents a more complex issue.  Under *U.S. v. Washington*, 764 F.2d 670 (9th Cir. 1985), the Skokomish Tribe holds the primary rights to fish in Hood Canal.  The Ninth Circuit defined a primary right as "the power to regulate or prohibit fishing" by the other rights-holding tribes.  *Id.* at 671.  Since that decision, the Skokomish have never granted the Suquamish rights to fish.  More importantly, the Skokomish—the entity entitled to regulate tribal fishing—entered a written agreement with the Navy to ensure mitigation of any harms to fishing in Hood Canal.  EHW64379 ("Memorandum of Agreement").  Under the agreement, the Navy will improve four

1  hatcheries (Hoodsport, McKernan, George Adams, and Enetai), and it will improve certain

2  beaches "to allow for shellfish seeding."  Memo. of Agreement, EHW64381–82.

3          The Suquamish contend that the Navy cannot "dispense with the Suquamish's treaty

4  rights by obtaining the consent of another tribe, *i.e.*, the Skokomish."  Tribe's Mot. for Prelim.

5  Inj. at 13, Dkt. #15.  They are correct: the Navy cannot.  However, the Skokomish can, and

6  appear to have done so.

7          The Skokomish possess, according to the Ninth Circuit, the power to regulate fishing by

8  the secondary rights holders in Hood Canal.  *Washington*, 764 F.2d at 671.  The Skokomish and

9  the Navy have agreed to "mutually resolve any differences regarding issues associated with the

10  effect of the EHW-2 project on the [Skokomish's] treaty resources."  Memo. of Agreement,

11  EHW64381.  If the primary right holder has agreed that the Navy's mitigation plan will

12  compensate for any loss, it is difficult to see how a secondary right holder can challenge the plan.

13  *Id.* at 64381 ("The parties agree that the mitigation measures compensate the Tribe for any

14  alleged impacts . . . .").

15          Third—and regardless of the two points above—the Tribe has not established that

16  construction of the new wharf will impact their right to take fish.  The Tribe argues that "the

17  project would reduce fish and shellfish populations and impair the Tribe's ability to exercise its

18  treaty rights north of the Hood Canal Bridge," where it has primary rights.  Tribe's Mot. for

19  Prelim. Inj. at 15, Dkt. #15.  Specifically, the Tribe is concerned with the juvenile summer-run

20  chum and the juvenile chinook runs.  *See id.* at 17.  In support, the Tribe highlights that the Army

21

22

23

24

1   Corps of Engineers found that the new wharf "will impact treaty fishing resources and will cause

2   the degradation of fish runs and habitat."[13]  *Id.*

3        The Navy commissioned studies by Science Applications International Corporation

4   ("SAIC"), which surveyed fish patterns in Hood Canal in 2005 through 2008.  *See* 2009 SAIC

5   Report, EHW41029; *see also* 2006 SAIC Report, EHW29083.  These studies break down salmon

6   by individual species—chum, pinks, coho, and chinook.  *See generally id.*  The SAIC surveys

7   show that juvenile chum and chinook are present only in very, very small numbers in January

8   and early February and are virtually nonexistent after July (*i.e.*, during the work window).  *See*

9   2006 SAIC Report at 18, 56, EHW29083.  For example, in the 2006 survey, SAIC caught less

10  than 15 chum per set[14] in late January through early March, but up to 610 per set at the peak of

11  the run in late March and April.  2006 SAIC Report at 20, EHW29108.  Based on these surveys

12  and the mitigation efforts, Defendants argue that construction will have no effect on the Tribe's

13  fishing.

14        In its reply brief, the Tribe noticeably restricts itself to arguing that the loss if its ***access*** is

15  more than *de minimis*.  *See* Tribe's Reply, Dkt. #44.  That argument is dispensed with above.  In

16  the mountain of documents in the record, the Court has difficulty finding any evidence that the

17  Tribe's fishing will be impacted.  Indeed, the Tribe appears to concede that 95% of juvenile

18  salmon migrate outside the work window.  *See* Zischke Decl. at 3, Dkt. #18 (appearing to

19  concede that this statement is correct; disputing only that the inclusion of hatchery fish and wild

20  fish together masks harm to the latter).  Regarding the 5% migrating within the work window,

21

22

[13] The Tribe quotes the Corps' Record of Decision at page 50, although it does not inform the Court where that document might be located in the Court's record.  Given that Defendants do not dispute the quote, the Court accepts it.

[14] SAIC used a beach seine net for its surveys.

1  the Tribe fails to present any argument suggesting that the Navy's mitigation measures will be

2  ineffective .

3       In sum, the Tribe has failed to show that either its right to access or its right to harvest

4  fish will be impacted.

5       **7.   The Tribe Fails to Show that the EIS Is Insufficient**

6       Next, the Tribe argues that the EIS is insufficient because: (1) it improperly minimized

7  the adverse affects by looking at harm to salmon overall, rather than harm to particular

8  endangered species; and (2) it contradicts itself "regarding the impacts of pile driving on

9  summer-run chum."  Tribe's Mot. for Prelim. Inj. at 17–18, 20, Dkt. #15.[15]

10       **a.   Minimization of Adverse Effects**

11       The Tribe asserts that the SAIC surveys fail to differentiate between hatchery salmon

12  (which are not ESA-listed) and wild salmon (which are).  Thus, by "lumping" the wild salmon in

13  with the hatchery fish, the Navy enlarged the denominator and diluted the protected species.

14  Tribe's Mot. for Prelim. In. at 19, Dkt. #15.

15

16

---

17  [15]  Defendants argue that the Court should strike the declaration of Jay Zischke, upon which the Tribe heavily relies.

18  Defs.' Resp. at 15.  A court should not consider evidence outside an agency's administrative record "to determine the correctness or wisdom of the agency's decision . . . ."  *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980);

19  *see also Sw. Cntr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996) (noting that judicial review is limited to the administrative record unless "necessary to determine whether the agency has considered all relevant factors and has explained its decision" or "when the agency has relied on documents not in

20  the record," or when "necessary to explain technical terms").

    Here, the Tribe relies on the Zischke declaration in different claims: first, on its claim of a violation of the Tribe's treaty rights; and second, on its claims under NEPA.

21      As to the first claim, the Court is not reviewing an agency decision; rather, it reviews the substantive effects of the decision (i.e., whether or not the EHW-2 will in fact violate the Tribe's treaty rights by diminishing fish

22  stocks).  This is, of course, tied to the correctness of the Navy's reasoning.  But the claim itself is not brought under the APA or NEPA, and it seems reasonable that the Tribe should be able to present evidence of a violation in any manner it chooses.  Thus, the Tribe may rely on the Zischke declaration.

23      The second claim is, however, different.  The Court is indeed reviewing the agency decisionmaking process under NEPA, and thus, the Zischke declaration can be used only in a limited capacity (*i.e.*, to ensure the agency

24  considered all relevant factors, *Biological Diversity*, 100 F.3d at 1450).

1    The Tribe relies on *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2005) in support of their

2    argument.  There, the Makah Tribe sought a permit to hunt gray whales.  The Ninth Circuit held

3    that an environmental assessment was invalid where it looked only at the impact the hunting

4    would have on "eastern Pacific gray whales overall" rather than on the local Washington area.

5    *Id.* at 490 ("The crucial question . . . is whether the hunting . . . of whales from this smaller group

6    could significantly affect the environment in the local area.").  Thus, an agency (and a court)

7    must determine the relevant environmental denominator—the size of the species against which

8    harm is  measured.

9    The Navy concedes that "[t]he SAIC catch data do not distinguish between ESA-listed

10   summer-run chum and non-listed fall-run chum."  Defs.' Resp. at 16 n.6, Dkt. #38.  But, "DNA

11   testing conducted in 2007 showed that summer-run chum were more prevalent from January

12   through mid-March . . . ."  *Id.* (citing 2009 SAIC Report at 9). Thus, juvenile chum migrate

13   almost exclusively during the work closure—ESA-listed or not.[16]  Appendix E to the EIS

14   contains the run timing of juvenile chum, amassing studies from 1980, 1983, 2000, and 2006.

15   *See* EIS, App. E at 1 (Table E-2).  Appendix E shows that five separate studies show that the

16   peak out-migration of juvenile summer-run chum occurs in March.

17   Moreover, the Navy's analysis does not suffer from the geographic fault found in

18   *Anderson*.  The Navy's studies focus on Hood Canal salmon, not a larger and inappropriate area.

19   As for the chinook run, while the Tribe argues that " a substantial percentage of juvenile

20   ESA-listed Chinook migrate . . . inside the work window," the Navy's studies suggest otherwise.

21

22   [16]  A review of the 2009 SAIC study shows that chum appear in negligible numbers in January and early February.

23   In the 2007 study, researchers caught two fish over a two-day period in the last week of January.  2009 SAIC Report
     at 64 (Table 8).  Over another two-day in the first week of February, researchers caught 39 total chum.  *Id.*  This
     compares with 4,652 fish at the peak in late April.  *Id.*  In 2009, researchers caught only 41 juvenile chum inside the

24   work window compared to 28,476 outside.  *See* Defs.' Demonstrative Ex., Dkt. #68-1 (Case No. 12-cv-5537).

1  The 2006 SAIC study shows that juvenile chinook run between late May and late June, tapering

2  to virtually nothing by the middle of July—the beginning of the work period.  2006 SAIC Report

3  at 18, EHW29105, Figure 8 ("Timing of juvenile salmonid abundance in nearshore areas of

4  Bangor").  Further, unlike chum, hatchery chinook are visually marked (by removal of the

5  adipose fin), and thus, wild chinook are distinguishable.  *Id.* at 21.  The 2006 study concludes

6  that catch rates "were typically zero from late January through May," and "[d]uring peak catches

7  in June," only 20% were identified as hatchery fish.  *Id.*  Thus, the study concludes that wild

8  chinook peak in June, that is, during the work closure.  "Only small catches of Chinook salmon

9  occurred from July through September," during the work period.  *Id.*  Appendix E to the EIS

10  confirms this conclusion.  In addition to the 2006 SAIC report, studies in 1977, 1978, 1980 show

11  that the peak juvenile chinook out-migration occurs in May and June.  EIS, App. E at 1 (Table E-

12  1).

13       In short, the Tribe appears unlikely to show that the EIS is insufficient here.

14            **b.  Contradictory Statement Regarding Adult Summer-Run Chum**

15       The Tribe argues that the EIS contradicts itself and thereby fails to acknowledge that

16  "adult summer-run chum will likely be exposed to injurious levels of underwater noise."  Tribe's

17  Mot. for Prelim. Inj. at 21, Dkt. #15.  The EIS states that adult summer-run chum are

18  distinguished "by their exclusive use of nearshore marine habitat early in the run period (early

19  August to October)."  EIS at 3.8-13.  The Tribe notes, however, that the EIS also states that adult

20  summer-run chum "would be present, and be impacted by elevated underwater noise," but "these

21  fish would likely display either a startle response or behavioral disturbance, including avoiding

22  the nearshore as a migratory pathway to their natal streams."  EIS at 3.8-39.

23

24

1   The Navy argues that the EIS properly discloses the risks of harm to adult summer-run

2   chum.  Indeed, the EIS explains that "field observation investigations of Puget Sound salmonid

3   behavior, when present near pile driving projects, found little evidence that normally nearshore

4   migrating salmonids move further offshore to avoid the general project area."  EIS at 3.8-37.

5   The EIS explains that salmon may startle as much at "visual stimuli" (e.g., the sight of piles

6   being driven) as to "underwater sound."  *Id.*  Thus, "it could be assumed that salmonids may alter

7   their normal behavior, including startle response and avoidance of the immediate project site,"

8   but they will not always do so.  *Id.*

9   The Court sees no effort in the EIS to mask the potential harm to adult summer-run

10   chum.  The EIS is 780 pages long (not counting its 13 appendices).  The Tribe has juxtaposed

11   two statements from that tome—out of context—and argued that they are misleading.  This is

12   precisely the "nit-picking" that courts should avoid.  If anything, the EIS bluntly discloses

13   possible harm to chum.

14   **8.   The Tribe Fails to Show a Likelihood of Success on its Claim under the Endangered Species Act**

15   The Tribe argues that the NMFS "ignores relevant biological information and reaches

16   contradictory conclusions about impacts on summer-run chum salmon."  Tribe's Mot. for Prelim.

17   Inj. at 24, Dkt. #15.  As the Tribe notes, the ESA requires that federal agencies ensure that their

18   actions are "not likely to jeopardize the continued existence of any endangered species or

19   threatened species" or adversely affect designated critical habitat.  16 U.S.C. § 1536(a)(2).

20   Here, the Tribe argues that various NMFS statements concerning the chum runs are

21   misleading or incorrect.  But, at this preliminary juncture, none of the Tribe's arguments suggest

22   that the NMFS's conclusion—that the proposed wharf will not jeopardize the species—is wrong

23

24

1  or without proper scientific basis.  Thus, the Tribe has not demonstrated a likelihood of success

2  on the merits.

3  **B. Plaintiffs Have Not Demonstrated a Likelihood of Irreparable Harm**

4       The Tribe cites as irreparable harms the loss of access to its fishing grounds and long

5  term harm to salmon.  Tribe's Mot. for Prelim. Inj. at 26, Dkt. #15.

6       Ground Zero argues that the Court should presume harm to the environment based on the

7  Navy's failure to comply with NEPA procedure, that construction will harm efforts to restore

8  Hood Canal, that recreational activities will suffer, and that public is harmed by the Navy's

9  nondisclosure.  Ground Zero Mot. for Prelim. Inj. at 22, Dkt. #19.

10       As the discussion above foreshadows, Plaintiffs have failed to establish a likelihood of

11  irreparable harm.  The Tribe will lose access to fishing grounds that it has no access to now, and

12  it has failed to demonstrate a likelihood that fish stocks will be impacted in any significant way.

13       Ground Zero falls similarly short.  It has failed to show a likelihood of succeeding on its

14  procedural claims or that the Navy's mitigation measures will be insufficient to offset the

15  unavoidable harms.

16  **C. The Balance of Equities and the Public Interest Do Not Weigh in Favor of a
   Preliminary Injunction**

17       The final two preliminary injunction factors "merge" when the government is the

18  opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Court considers the balance of

19  harm and the public interest together.  Here, the balance of harm and public interest weigh

20  against granting a preliminary injunction.

21       The Court recognizes that Plaintiffs' concerns are not trivial.  The Suquamish and the

22  public have a significant interest in upholding tribal treaty rights and preserving the natural

23

24

1   environment.  Similarly, Ground Zero seeks to protect the public interest in the environment and

2   access to information.  Ground Zero's Mot. for Prelim. Inj. at 24, Dkt. #19.

3       The Navy presents an equally powerful public interest: national security.  *See Winter*, 555

4   U.S. at 26.  Here, the Navy is not merely reciting "national security" to avoid its often

5   laborious—but crucial—NEPA responsibilities.  Nor is it using national security to trample the

6   Suquamish's treaty rights.  The Navy has determined that it must increase the number of

7   operational days at Bangor and that the only way to do this is by constructing a new explosives

8   handling wharf.  Benedict Decl. ¶¶ 2, 9.  A delay in commencing construction would

9   significantly impact the Navy's ability to service its missiles.  The Court is not particularly

10  knowledgeable about missile maintenance, but it has little trouble accepting its importance.

11      Courts have no certain way to quantify the importance of competing public interests—

12  particularly given the interests here: the environment, tribal rights, and national security.  There

13  is no calculus to perform.  But the Court finds Plaintiffs unlikely to succeed on the merits and

14  equally unlikely of suffering irreparable harm.  Plaintiffs have not established why the equities

15  should favor them or why the interests they represent should win out.  They have thus failed to

16  carry their burden.

17              **IV.   CONCLUSION**

18      As should be obvious from the sheer length of this order, the issues presented are

19  numerous and sometimes complex.  At this stage, the Navy's EIS, the result of years of

20  preparation, appears to be a thorough and accurate assessment of the environmental impacts of

21  the proposed wharf.  Plaintiffs' interests—environmental protection, public disclosure, treaty

22  rights—are not trivial.  Yet, they have not met the legal standards necessary for this Court to

23

24

1  issue a preliminary injunction.  Therefore, Plaintiffs' Motions for Preliminary Injunction, Dkt.

2  #19 (Case No. 12-cv-5537), Dkt. #15 (Case. No. 12-cv-1455) are **DENIED**.

3           Dated this 11th day of January, 2013.

4

5           _____
            Ronald B. Leighton
6           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24